PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,

      *Plaintiff-Appellee,*

v.

TIMOTHY TYRONE HORTON,

      *Defendant-Appellant.*

No. 11-4052

Appeal from the United States District Court
for the Eastern District of North Carolina, at Wilmington.
James C. Fox, Senior District Judge.
(5:08-cr-00060-F-1)

Argued: May 18, 2012

Decided: August 30, 2012

Before AGEE, DAVIS, and THACKER, Circuit Judges.

---

Affirmed in part, vacated in part, and remanded in part by published opinion. Judge Agee wrote the opinion, in which Judge Thacker joined. Judge Davis wrote a separate opinion concurring in part and concurring in the judgment

---

## COUNSEL

**ARGUED:** Samuel A. Forehand, LAW OFFICE OF SAMUEL A. FOREHAND, PA, Raleigh, North Carolina, for Appellant. Kristine L. Fritz, OFFICE OF THE UNITED

STATES ATTORNEY, Raleigh, North Carolina, for Appellee. **ON BRIEF:** Thomas G. Walker, United States Attorney, Jennifer P. May-Parker, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Raleigh, North Carolina, for Appellee.

---

### OPINION

AGEE, Circuit Judge:

Timothy Tyrone Horton appeals his conviction for possessing a firearm while a convicted felon, in violation of 18 U.S.C. §§ 922(g)(1) and 924, and also appeals the district court's imposition of a sentence of life imprisonment. For the reasons set forth herein, we affirm Horton's conviction. We conclude, however, that the district court erred in applying the murder cross-reference provision in *United States Sentencing Guidelines Manual* ("USSG" or "Guidelines") § 2K2.1(c)(1) and in treating as relevant conduct a murder that occurred during the course of an unrelated and uncharged offense, which error substantially increased Horton's advisory Guidelines range. Accordingly, we vacate Horton's sentence and remand for resentencing.

## I.   Background and Proceedings Below

The offense for which Horton was charged, and ultimately convicted by a jury, occurred on August 10, 2007.[1] On that date, Horton was at the home of his girlfriend, Timeca Bryant. The couple argued after Ms. Bryant learned Horton had a gun, which he told her he was holding for a friend. Horton left the home and, while outside, fired three shots, one of which hit Ms. Bryant's unoccupied vehicle. He fired the other two into the air. Ms. Bryant came out and obtained Horton's gun. She

---

[1]We provide a broad overview of the facts here and discuss additional procedural and factual aspects of the case in context.

then returned to her home, taking the gun with her, and locked herself inside. Once inside, she called the police, and Horton left the premises. When police arrived, officers found three spent .22 casings, a bullet hole in Ms. Bryant's car, and retrieved from Ms. Bryant the gun—a .22 rifle with a sawed-off stock and sawed-off barrel. Investigation revealed that the gun had been stolen during a breaking and entering of an Exxon store in July 2006.

In February 2008, Horton contacted the police and said he wanted to speak with them about this incident, at which point he confessed to possession of the gun on August 10, 2007. He was arrested and charged in this case with violating 18 U.S.C. §§ 922(g)(1) and 924, being a felon in possession of a firearm.

Horton pled not guilty and proceeded to a trial by jury. The jury in his first trial was unable to reach a verdict and the court declared a mistrial. After a second trial, the jury found Horton guilty and he was sentenced by the district court to life imprisonment. Horton filed a timely motion for new trial, which the district court denied. He timely appealed from both the conviction and sentence, and from the denial of his motion for new trial.

This Court has jurisdiction pursuant to 28 U.S.C. § 1291 and 18 U.S.C. § 3742.

## II.   Challenges to the Conviction

Horton raises two challenges to his conviction. First, he contends that the district court abused its discretion in denying his motion for substitution of counsel. Second, he argues that the district court abused its discretion in denying his motion for new trial predicated on what Horton describes as the Government's failure to disclose material impeachment evidence under *Brady v. Maryland*, 373 U.S. 83 (1963). For

the reasons discussed below, we reject both of these challenges.

### A.   Motion to Substitute Counsel

We first address Horton's claim that the district court erred in denying his motion for substitute counsel. Clarke Speaks was appointed as Horton's counsel on March 25, 2008. On October 1, 2008, two months before his scheduled arraignment, Horton filed a pro se motion for substitute counsel, his first such motion. In the motion, Horton asserted that he was "not satisfied with Mr. Clark Speaks [sic] representation and believe[d] it [to] be in [his] best [i]nterest for a change of counsel . . . ." (JA 87.) He offered no additional details in support of his motion.

The district court denied the motion without a hearing in an order filed October 7, 2008. In that order, the court "advised" Horton that, although "he has a Constitutional right to court-appointed counsel if he is unable to afford an attorney, he is not entitled to appointment of the attorney of his choice." (JA 88 (citations omitted).) The order further informed Horton that he could "go forward with his court-appointed counsel, Mr. Speaks," or he could "represent himself, with Mr. Speaks acting as back-up counsel to assist him with legal questions that may arise." (*Id.* at 89.) In its order, the district court also noted that Horton would be required prior to his arraignment on December 8, 2008, to advise the court under oath whether he wanted to continue with Speaks' representation or to represent himself with Speaks as back-up counsel. This inquiry never took place, although the court did ask general questions regarding Horton's satisfaction with this attorney, and Horton did not express any dissatisfaction. Neither Horton nor Speaks ever raised the issue with the court again and Speaks represented Horton at both trials.

On February 17, 2010, approximately three months after the jury verdict convicting Horton, Speaks moved to with-

draw from representation. His motion included the statement that he and Horton, "[d]uring the course of the Attorney-Client Relationship . . . have reached an impasse resulting from irreconcilable differences" and that this impasse was "prevent[ing] the communication necessary to prepare and implement an adequate defense." (JA 587.) The court granted the motion without a hearing, and directed the Federal Public Defender to assign substitute counsel, which was done.

We review the denial of Horton's motion for substitute counsel for abuse of discretion. *See United States v. Smith*, 640 F.3d 580, 587-91 & n.6 (4th Cir. 2011). In cases where a district court has denied a request by a defendant to replace one court-appointed lawyer with another court-appointed lawyer, this Court considers three factors to determine whether the initial appointment "ceased to constitute Sixth Amendment assistance of counsel": "(1) the timeliness of the motion; (2) the adequacy of the court's subsequent inquiry; and (3) 'whether the attorney/client conflict was so great that it had resulted in total lack of communication preventing an adequate defense.'" *Id.* at 588 (quoting *United States v. Gallop*, 838 F.2d 105, 108 (4th Cir. 1988)).

Applying these factors here, it is clear that the motion was timely made, and the Government does not contend otherwise. Similarly, the Government does not contend-nor could it-that the district court made any inquiry into the reasons for Horton's dissatisfaction with his counsel. This fact distinguishes this case from *Smith*, in which there was at least some inquiry into the reasons for the dissatisfaction and we held there was no abuse of discretion. Here, because of the district court's complete failure to conduct any inquiry, this Court is essentially left with an incomplete record upon which to determine the third factor: the extent of the breakdown in communication and whether it was so great that it prevented an adequate defense. Accordingly, we will assume, without deciding, that the district court abused its discretion in denying Horton's motion without conducting any inquiry into the

reasons for his dissatisfaction with counsel or any inquiry as to the extent of any breakdown in communication.

We nonetheless conclude that Horton is not entitled to a reversal of his conviction because the error was harmless and did not result in any prejudice to him. *See, e.g.*, Fed. R. Crim. P. 52(a) ("Any error, defect, irregularity, or variance that does not affect substantial rights must be disregarded."); *United States v. Young*, 470 U.S. 1, 13 n.10 (1985) (in addressing claim of prosecutorial misstatements, "a reviewing court could reverse an otherwise proper conviction only after concluding that the error was not harmless."); *United States v. Wilks*, 46 F.3d 640, 644 (7th Cir. 1995) ("Even if . . . the district court abused its discretion when it denied [the defendant's] request for new counsel, such an error [was] harmless" because defendant failed to show that counsel rendered constitutionally ineffective assistance and thus there was no Sixth Amendment violation).

In this case, there is clear evidence that Speaks provided an adequate defense at both trials. For example, he filed pre-trial motions in limine, he cross-examined government witnesses, and he strongly advocated for his client throughout both trial proceedings. Indeed, the first trial resulted in a hung jury, which is attributable in some part to Speaks' performance as an adequate advocate for Horton.

Notably, Horton does not identify—let alone show—any specific way in which his defense was hampered by any lack of communication with his counsel. In fact, on two different occasions after Horton's motion to substitute was denied, he appeared before the district court and was placed under oath. By his failure to assert otherwise in response to questions posed by the court, Horton indicated that he had "ample opportunity to discuss his case with his attorney," that he had "discussed his case with his attorney," and that he was "completely and fully satisfied with his attorney's services." (JA 103, JA 120.) Thus, Horton's own representations to the court

refute that there were significant communication problems prior to or during the trials.[2]

The record indicates that at some point *after* Horton was convicted and prior to sentencing, when counsel asked to withdraw and was in fact replaced, communication had broken down to some extent between Speaks and Horton. But based on the complete record before us, we conclude that any error in failing to appoint substitute counsel at the time Horton requested it was harmless. Accordingly, Horton is not entitled to have his conviction vacated on this ground.

### B.   Motion for New Trial

Horton's second challenge to his conviction is based on the district court's denial of his motion for a new trial. In that motion, he alleged that the Government failed to disclose material impeachment evidence until after his trials. He argues on appeal that the district court's order denying his motion constituted an abuse of discretion and that he is entitled to a new trial.

Horton's argument as to the alleged *Brady* evidence focuses on the testimony of two police officers regarding his confession to the charged offense, which was not videotaped, and the reasons for the failure to do so. Specifically, at both trials the juries heard evidence concerning Horton's unrecorded confession to possessing the firearm, which he made

---

[2]While these representations to the court further support our conclusion that Horton and his counsel were still able to communicate and that Horton's Sixth Amendment right to counsel was not violated, we do not treat these communications as a waiver by Horton of the issue, as the Government argues we should. When he appeared in court, Horton's motion for substitute counsel had already been denied and he had been informed that his only choices were to either proceed pro se with Speaks as back-up counsel or be represented by Speaks. Under these circumstances, we conclude that Horton preserved a Sixth Amendment claim based on that denial.

during a custodial interview on February 4, 2008. There were two officers present at the time of Horton's confession, ATF Special Agent Fanelly and Raleigh Police Department Officer Nickel.[3] Fanelly was conducting the interview and Nickel was merely present. At Horton's first trial, Fanelly testified that he did not record the interview because ATF agents never record interviews, he did not know if the interview room was equipped with recording devices, and he did not know how to use such devices. Nickel did not testify at the first trial.

At the second trial, both officers testified that the reason they did not record their interrogation of Horton was that it did not relate to a homicide investigation, and the law only required such recording as part of homicide investigations.[4] Fanelly also testified that, at the start of the interview, he "told [Horton] what [they were] there to talk about, and [Horton] said he wanted to talk about the — his arrest for having the gun at — recovered at his girlfriend's house." (JA 446.)

On appeal, Horton attaches much significance to the fact that both juries asked questions regarding his confession. In the first trial, the jury inquired whether Horton's statement to the police was documented. In the second, the jury asked to "see [a] transcript of the interview . . . if there is one[.]" (JA 521.) Horton posits that the additional explanation offered by the officers at his second trial, which he contends was false, tipped the scales in favor of conviction.

In his motion for new trial, Horton claimed that an investigative police report prepared by R. Miller of the Raleigh

---

[3]The two officers' names are spelled in different ways throughout the record. We use the spellings the parties adopted before this Court.

[4]The North Carolina law requiring the recording of interviews related to a homicide did not take effect until March 1, 2008, after the interview at issue was conducted, a fact that Horton acknowledges in his brief. Thus, there is no allegation that, even if he were a homicide suspect and this was a homicide interview, the interview was required by state law to be recorded at that time.

Police Department ("the Miller Report") was *Brady* evidence that should have been disclosed prior to trial, but which was not. According to Horton, the report shows that, by at least October 9, 2007, the "Raleigh Police Department was, in fact, conducting a homicide investigation of Horton" and that "Fanelly was, in fact, involved in [that] investigation." (JA 821, Mot. for New Trial.) Horton argued that he was entitled to a new trial because the Government never disclosed that report to him,[5] and he "should [have been] able to use [the Miller Report] to rebut Nickel's and Fanelly's testimonies that they declined to record their 4 February 2008 interview of Horton on the ground that said interview was not related to a homicide investigation, as well as to impeach Nickel's and Fanelly's credibility for testifying to same." (JA 822.)

Horton contends that, in denying his motion for new trial, the district court applied the wrong legal standard and thus abused its discretion.[6] He also argues that, applying the proper standard for *Brady* violations, he is entitled to a new trial.

In response, the Government posits that, although the report itself might not have been disclosed prior to trial, both "the

---

[5]The motion included an affidavit from trial counsel, Speaks, in which he averred that the Government had never provided the report to him, and that "[a]t no time during my service as defense counsel . . . did I have any reason to believe that the 4 February 2008 custodial interview of the defendant that ATF Special Agent Fanelly and Raleigh Police Department Officer Nickel conducted at the Raleigh Police Department was related to a homicide investigation." (JA 894.)

[6]In its order denying the motion, the district court did not apply a *Brady*-type analysis. Instead, it analyzed Horton's motion under the standards in our decisions in *United States v. Bales*, 813 F.2d 1289, 1295 (4th Cir. 1987), and *United States v. Custis*, 988 F.2d 1355, 1359 (4th Cir. 1993), applicable in analyzing whether newly-discovered evidence requires a new trial. In conducting its analysis, the district court reasoned that even if the evidence had been used to impeach the credibility of Nickel and Fanelly, the evidence was not likely to result in an acquittal. Horton argues that this was the wrong test, and the Government does not contest that assertion in its brief.

defendant and trial counsel were aware, well before the first trial, that the defendant was [the] subject of an ongoing homicide investigation at the time he was interviewed on February 4, 2008. (*See* J.A. 46, 60, 67-69, 72, 82-83.)" (Gov't Br. at 42.) As the Government notes, at the hearing on Horton's motion to suppress, Fanelly testified that he had informed Horton he was being investigated for a number of crimes, including "a drug-related homicide" (JA 67), but that Horton "said he didn't want to talk about the homicide or the carjacking, that he just wanted to talk about the gun recovery from August 10th." (JA 69.) Fanelly further testified at the suppression hearing that he made it "perfectly clear" to Horton that he (Fanelly) wanted to talk about the homicide, but when Horton refused to discuss it, Fanelly let him talk about the August 10, 2007 incident. (JA 72.) So, the fact that Horton was a homicide suspect at the time of the February 2008 interview was well known to Horton and his counsel at least as early as the suppression hearing, and certainly before trial.

The Government further points to the important fact that Horton's "trial counsel successfully moved in limine before both trials to exclude from evidence 'any reference to the existence [of other pending charges], as well as any detail or circumstances surrounding such charges.'" (Gov't Br. at 44 (alteration in original).) Accordingly, to introduce evidence of the Miller Report or the mere fact that Horton was a homicide suspect would have contradicted the district court's prior ruling on Horton's own motion in limine. Finally, the Government argues that Horton is overstating on appeal the impeachment value of the Miller Report. The Government's arguments are convincing.

The standard of review here is settled:

> [m]otions for a new trial based on an alleged *Brady* violation are reviewed for abuse of discretion. It is an abuse of discretion for the district court to commit a legal error—such as improperly determining

whether there was a *Brady* violation—and that underlying legal determination is reviewed de novo. *See United States v. Llamas*, 599 F.3d 381, 391 (4th Cir. 2010) (quoting *United States v. Delfino*, 510 F.3d 468, 470 (4th Cir. 2007) ("A district court abuses its discretion when it commits an error of law.")).

*United States v. Wilson*, 624 F.3d 640, 660-61 n.24 (4th Cir. 2010). As we have noted, the district court applied the wrong legal standard to Horton's claim, *see supra* at note 6, but the record before us is fully developed such that we can address Horton's argument as to an alleged *Brady* violation de novo. Applying the proper legal standard, we conclude that Horton has not established that a *Brady* violation occurred or that he is entitled to a new trial.

In *Wilson*, we set forth the basic framework of analysis for a new trial motion based on a *Brady* violation:

> In *Brady*, the Supreme Court held "that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. at 87. In order to prove that the Government's failure to tender certain evidence constitutes a *Brady* violation, the burden rest[s] on [the defendant] to show that the undisclosed evidence was (1) favorable to him either because it is exculpatory, or because it is impeaching; (2) material to the defense, *i.e.*, "prejudice must have ensued"; and (3) that the prosecution had materials and failed to disclose them. *United States v. Stokes*, 261 F.3d 496, 502 (4th Cir. 2001).

624 F.3d at 660-61.

We further explained the relevant concepts as follows: "Evidence is 'exculpatory' and 'favorable' if it 'may make the difference between conviction and acquittal' had it been 'disclosed and used effectively.' *United States v. Bagley*, 473 U.S. 667, 676 (1985). Evidence is 'material' if it is 'likely to have changed the verdict.' *Moseley v. Branker*, 550 F.3d 312, 318 (4th Cir. 2008)." *Wilson*, 624 F.3d at 661; *see Winston v. Kelly*, 592 F.3d 535, 556 (4th Cir. 2010) ("[T]he materiality element of a *Brady* claim requires a collective assessment of whether introduction of the exculpatory evidence might have affected the outcome of the trial.").

Applying this test here, we conclude that Horton cannot satisfy the second factor, *i.e.*, that introduction of the exculpatory evidence might have affected the outcome of the trial; we thus need not address the first or third factors.[7] Importantly, we agree with the Government that the Miller Report would have had a minimal impact, if any, on the credibility of the officers. This is so because the officers had a plausible explanation, consistent with their testimony and the Miller Report, that renders the report largely insignificant. That is, Fanelly testified at the suppression hearing that Horton was a suspect in a homicide, but that the interview itself did not relate to the homicide, because Horton repeatedly told the officers he did not want to talk about the homicide. There is nothing in Fanelly's explanation that is inconsistent with the Miller Report's conclusion that Horton was brought in as a homicide suspect, but then (from the start of the interview, when Horton refused to be interviewed about anything other than the gun possession incident on August 10, 2007), that interview was not related to the homicide investigation.

Indeed, Horton's own motion in limine was at least one factor that prevented Fanelly from providing a fuller explana-

---

[7]Although it used the different *Custis/Bales* analysis, *see supra* n.6, the district court properly based its denial of Horton's motion for new trial on the lack of effect on the outcome of the trial, as well.

tion to the jury.[8] Because Fanelly was not permitted to state that Horton was being investigated for a homicide, he could not explain before the jury that the interview did not relate to a homicide because Horton refused to discuss it and instead would only talk about the gun possession charge on August 10, 2007. Fanelly was able to explain that fact fully at the suppression hearing (when the jury was not present), and gave as full an explanation as he could to the jury at the second trial, without violating Horton's in limine motion. At argument before this Court, Horton's counsel admitted that, if the Miller Report had been available to trial counsel and he had used it for impeachment purposes, the jury would have learned that Horton was a suspect in a homicide, evidence that Horton obviously believed was prejudicial, or he would not have moved in limine to exclude it. Given this trade-off, we think it highly unlikely that, if counsel elected to use it as impeachment evidence, this evidence would have changed the outcome of Horton's trial. It borders on the disingenuous for Horton to claim the benefits of the granted motion in limine at trial, but now seek to eschew it on appeal.

Moreover, there was strong evidence against Horton other than his confession, including the testimony of his girlfriend at the time of the incident. The Government also introduced into evidence the spent shell casings and the gun itself that were recovered from the ground outside Ms. Bryant's home and from inside her home, respectively. Additionally, the officer who initially reported to the scene testified that he observed a bullet hole in Ms. Bryant's car, and that Ms. Bryant appeared "a little shaken and upset" when he arrived. (JA 402.) Thus, the credibility of the officers as to Horton's confession, while important to the case against him, was only part of the case presented to the jury. In short, no *Brady* violation occurred and Horton is not entitled to a new trial.

---

[8]It is also possible that it would have violated Horton's right against self-incrimination under *Miranda v. Arizona*, 384 U.S. 436 (1966) for Agent Fanelly to testify about Horton's refusal to talk about the homicide.

### III.   Challenges to the Sentence

Horton also appeals his sentence, challenging on appeal the district court's application of the murder cross-reference. He raises four separate claims of error (three of which relate to the application of the cross-reference), but because of our holding, we need only address two.[9] The first claim we address is Horton's argument that the district court erred in its factual finding that he was present or involved in the home invasion and robbery during which the murder occurred. The second is his argument that the district court misapplied the Guidelines and erred in concluding that the murder was "relevant conduct" to the offense of conviction. We address each of these challenges in turn.

In doing so, we are mindful of our role, which is that "[w]e review a sentence for reasonableness, applying an abuse of discretion standard." *United States v. Susi*, 674 F.3d 278, 282 (4th Cir. 2012) (citing *Gall v. United States*, 552 U.S. 38, 49 (2007)).

> In conducting that review, [we] first "ensure[ ] that the district court committed no significant procedural error, such as failing to calculate (or improperly calculating) the Guidelines range, treating the Guidelines as mandatory, failing to consider the § 3553(a) factors, selecting a sentence based on clearly errone-

---

[9]In his third challenge to the application of the murder cross-reference, Horton maintains that if the district court properly applied the Guidelines in this case and if the Guidelines are so broad as to allow the use of an uncharged, unrelated murder to dramatically increase Horton's offense level, then the Guidelines violate Horton's Sixth Amendment rights. Horton's fourth contention, unrelated to the murder cross-reference, is that the district court erred both in treating the advisory Guidelines as mandatory and in failing to adequately consider the 18 U.S.C. § 3553(a) factors.

Because we conclude that the Guidelines do not allow the application of the murder cross-reference here, and because we remand for resentencing, we do not address these arguments.

ous facts, or failing to adequately explain the chosen sentence . . . ." [*Gall*, 552 U.S.] at 51. If we find no significant procedural error, then we consider the substantive reasonableness of the sentence imposed . . . .

*Id.*

In this case, because we conclude that the district court committed a significant procedural error, we do not reach the substantive reasonableness of Horton's sentence. *See United States v. Carter*, 564 F.3d 325, 328 (4th Cir. 2009) (appellate court can consider the substantive reasonableness of a sentence "[i]f, and only if" it "find[s] the sentence procedurally reasonable"); *id.* at 330 n.4 ("Having found the sentence procedurally unreasonable, . . . we cannot review the sentence for substantive reasonableness.").

## A.    Additional Background as to Sentencing

The presentence report ("PSR") prepared by the Probation Office first discussed the facts of the only offense charged in the indictment and the only offense of which Horton was convicted—the August 10, 2007 events at Ms. Bryant's home. Nonetheless, the bulk of the sentencing proceeding was devoted to testimony regarding a second incident, which the PSR determined—and the district court agreed—was "relevant conduct."

According to the PSR, this second incident occurred on August 17, 2007, one week after Horton possessed the firearm and fired the shots outside Ms. Bryant's home. On August 17, five adults and five children were present in an apartment in Raleigh when one of the adults, Charmeka Harris, opened the door in response to knocking. Three masked individuals, at least two of whom were armed, then barged into the apartment and robbed the occupants of various belongings at gunpoint. Upon entering the residence, one of the assailants shot

Ms. Harris in the stomach with a sawed-off shotgun and she later died from the injury.

There were numerous inconsistencies in the victim and witness statements regarding various aspects of the home invasion, including how many assailants participated, how many of them were armed, and what they looked like, to the extent that they were not disguised. The attempts by victims to identify the assailants through subsequent line-ups were unsuccessful and the shotgun was never recovered.

In addition to the victims and some non-victim witnesses at the apartment complex, several other individuals provided statements to authorities concerning their knowledge of the robbery/murder. Most of these were from persons who indicated they had heard the alleged perpetrators of the robbery discussing it, or heard second-hand of comments made by them. Some of these statements implicated Horton, either as being involved in the robbery or being the shooter, and others indicated that he was not present or involved and instead identified others as the perpetrators. Ultimately, the police investigation into the incident identified Horton and four others whom the investigators believed were participants in the robbery.[10]

Based on the foregoing, the PSR concluded that

> the preponderance of the evidence supports that [Horton] possessed a firearm during the robbery/home invasion on August 17, 2007, and he is responsible for the murder of Charmeka Harris. As such, he possessed a firearm as a convicted felon in connection with another felony offense, First Degree

---

[10]A grand jury for Wake County, North Carolina returned indictments against Horton and three other individuals, charging them with the murder of Ms. Harris on August 17, 2007. This state court murder charge against Horton was dismissed shortly after his sentencing in this case.

Murder, and a cross-reference to the substantive offense is warranted.

(JA 935, ¶ 5.) Accordingly, the PSR computed and explained Horton's base offense level as follows:

The United States Sentencing Commission Guideline for violation of 18 U.S.C. § 922(g) is found in 2K2.1; however, 2K2.1(c)(1) provides that if the defendant used or possessed any firearm or ammunition in connection with the commission or attempted commission of another offense . . . apply 2X1.1 in respect to that other offense, if the resulting offense level is greater than that determined under 2K2.1. If death resulted, apply the most analogous offense guideline from Chapter 2, Part A, Subpart 1, if the resulting offense level is greater than that determined above. Pursuant to 2X1.1(a), the base offense level is determined from the guideline for the substantive offense, plus any adjustments from such guideline for any intended offense conduct that can be established with reasonable certainty. [Horton] possessed a firearm in connection with the robbery on August 17, 2010. As Horton is responsible for the shooting death which occurred during the robbery, the guideline for First Degree Murder ([USSG §] 2A1.1) has been used and calls for a base offense level of 43.

(JA 947, ¶ 46.)

At sentencing, the district court heard testimony from two police detectives who had investigated the home invasion and shooting concerning their investigation and the various statements they received. The court ultimately concluded that the preponderance of the evidence supported the finding that Horton possessed a firearm during the August 17, 2007 robbery/home invasion.

The district court further found the August 17 murder was relevant conduct to the August 10 instant offense, which led to the significant increase in Horton's base offense level based on the cross-referencing provision. The district court thus adopted the PSR's computation of Horton's base offense level, which used the Guideline for First Degree Murder (USSG § 2A1.1) instead of the lower offense level for a simple felon-in-possession charge. (*Id.* at 947, ¶ 46.) This resulted in a base offense level of 43 instead of the lower offense level applicable to § 922(g)(1) violations.[11]

Horton had 15 criminal history points, establishing a criminal history category of VI. He was also an armed career criminal, which provides an independent ground for establishing a criminal history category of VI. The advisory Guidelines range, as determined by the district court, called for life imprisonment, and the applicable statutory provision (18 U.S.C. § 924(e)) required a mandatory minimum of not less than 15 years. The district court imposed a sentence of life imprisonment.

## B.   Factual Finding as Error

In assessing whether a district court properly calculated the Guidelines range, including its application of any sentencing enhancements, this Court "review[s] the district court's legal conclusions *de novo* and its factual findings for clear error." *United States v. Layton*, 564 F.3d 330, 334 (4th Cir. 2009).

---

[11]There is apparently some dispute as to what Horton's offense level would have been had the cross-reference for murder not been applied. The Government contends that the total offense level would have been 34 and Horton's advisory Guidelines range would have been 262 to 327 months' imprisonment. In his sentencing memorandum before the district court, however, Horton argued that his total offense level should have been 33, with an advisory Guidelines range of 235 to 293 months. Because it applied the murder cross-reference, the district court did not need to resolve this dispute. Since we are remanding with instructions not to apply the murder cross-reference, however, this is an issue for the district court to address in the first instance.

We first address Horton's contention that the district court clearly erred in finding, as a factual matter and by a preponderance of the evidence, that Horton was involved in the August 17, 2007 robbery and responsible for the murder of Ms. Harris. As noted, we review this factual finding only for "clear error," which is a very deferential standard of review, allowing us to reverse only if we are "left with a definite and firm conviction that a mistake has been committed." *F.C. Wheat Mar. Corp. v. United States*, 663 F.3d 714, 723 (4th Cir. 2011). While there was some conflicting evidence on the point, the district court heard extensive testimony from two agents regarding the investigation into the murder of Ms. Harris and there was sufficient evidence to support a finding, by a preponderance of the evidence, that Horton committed the murder. Thus, to the extent that Horton challenges the district court's factual finding that he committed the murder as unsupported by reliable evidence, he has not shown error under the applicable standard of review.[12]

---

[12]We respectfully disagree with our colleague's conclusion as to Section III-B. We addressed Horton's arguments in their logical order. If we had concluded that the district court clearly erred in its factual determination regarding the August 17, 2007 murder, the more complicated issue of the murder cross-reference's applicability would not have been reached. Both this Court and other appellate courts routinely affirm factual findings relevant to sentencing decisions, even when remanding for resentencing based on other errors. *See, e.g.*, *United States v. Llamas*, 599 F.3d 381, 388-90 (4th Cir. 2010) (reversing and remanding where district court erred in applying a "vulnerable victim" adjustment without an adequate explanation, but affirming the application of an aggravating role adjustment because it was not clearly erroneous); *United States v. Manatau*, 647 F.3d 1048, 1057 & n.4 (10th Cir. 2011) (vacating sentence for a new determination of intended loss, but finding district court properly applied separate enhancement for the number of victims); *United States v. Flores*, 640 F.3d 638, 644-45 (5th Cir. 2011) (remanding for resentencing because a leadership role enhancement was based on erroneous facts, but affirming obstruction of justice enhancement); *United States v. Newman*, 614 F.3d 1232, 1238-39 (11th Cir. 2010) (reversing and remanding for resentencing because district court erred in applying enhancement for "extensive scope" of offense, but affirming district court's application of an enhancement for

That fact alone, however, does not establish the propriety of applying the cross-reference. As noted, Horton also argues that, even assuming the district court's factual finding that he committed the murder was proper, the application of the cross-reference is nonetheless improper. We turn to this contention next.

---

interfering with the administration of justice); *United States v. Williams*, 527 F.3d 1235, 1252 (11th Cir. 2008) (remanding for resentencing because sentencing adjustments for aggravated role and for abuse of trust were unjustified, but nonetheless affirming the district court's finding that the defendant obstructed justice).

Moreover, while we have concluded that the murder of Ms. Harris is irrelevant to determining the appropriate advisory Guidelines range, it is up to the district court to decide whether to take it into consideration at sentencing pursuant to the court's § 3553(a) determination. *See Gall*, 552 U.S. at 49-50 ("[t]he Guidelines are not the only consideration . . . . [A]fter giving both parties an opportunity to argue for whatever sentence they deem appropriate, the district judge should then consider all of the § 3553(a) factors to determine whether they support the sentence requested by a party."); *United States v. Hernandez-Villanueva*, 473 F.3d 118, 122 (4th Cir. 2007) (district court is required to "determine whether a sentence within [the advisory] range . . . serves the factors set forth in § 3553(a) and, if not, select a sentence [within statutory limits] that does serve those factors.") (citation omitted); *United States v. Grubbs*, 585 F.3d 793, 799, 802 (4th Cir. 2009) (after *Booker*, "[s]entencing courts continue to exercise their long-standing authority to hear the evidence, and consider any evidence at sentencing that 'has sufficient indicia of reliability[,]'" including evidence of uncharged conduct). Of course, if the district court imposed an above-Guidelines sentence on remand, it would be required to provide sufficient explanation for its chosen sentence and any "major" departure would require a "more significant justification than a minor" one. *Gall*, 552 U.S. at 50.

Finally, we disagree with our colleague's statement that there is "no authority" for the district court to decline to revisit this factual issue at resentencing. *Post* at 32. In fact, this Court has squarely held that the district court would be "well within its authority to decline to revisit every sentencing issue on remand, unless the mandate indicates otherwise or the interrelationship of sentencing components makes it advisable to do so." *Susi*, 674 F.3d at 286; *id.* at 284 ("[n]othing in *Pepper [v. United States*, 131 S. Ct. 1229 (2011)] . . . requires the district court to reconsider every component of the sentencing decision during resentencing").

### C.   Application of the Cross-Reference

As noted above, the PSR recommended—and the district court concluded—that the August 17, 2007 robbery and murder were relevant conduct for sentencing purposes. In assessing the propriety of that determination, three provisions of the Sentencing Guidelines are pertinent: (1) USSG § 2K2.1(c)(1) ("the Cross-Reference Provision"); (2) USSG § 1B1.3 ("the Relevant Conduct Guideline"); and (3) USSG § 3D1.2 ("the Grouping Guideline"). We now discuss the interrelation of these provisions in determining whether the district court erred in its Guidelines determination.

The offense level for a violation of 18 U.S.C. § 922(g)(1), the offense of conviction here, is established under USSG § 2K2.1. Subsection (c) of this Guideline, the Cross-Reference Provision, states in relevant part:

> If the defendant used or possessed any firearm or ammunition in connection with the commission or attempted commission of another offense, or possessed or transferred a firearm or ammunition with knowledge or intent that it would be used or possessed . . . in connection with another offense, . . . [and] (B) if death resulted, [the court should apply] the most analogous offense guideline from Chapter Two, Part A, Subpart 1 (Homicide), if the resulting offense level is greater than that determined above.

USSG § 2K2.1(c)(1).

Applicability of the Cross-Reference Provision, in turn, depends on whether the cross-referenced offense constitutes relevant conduct under the Relevant Conduct Guideline. *See* USSG § 1B1.3(a) (cross-references are to be determined on the basis of relevant conduct unless otherwise specified); *United States v. Pauley*, 289 F.3d 254, 258 (4th Cir. 2002), *vacated in non-relevant part on reh'g*, 304 F.3d 335 (4th Cir.

2002) (per curiam), ("Under the scheme created by the [USSG], whether a particular cross-reference should be applied depends on whether the conduct to which the cross-reference refers is 'relevant conduct'" as defined in the Relevant Conduct Guideline). Put differently, only conduct that also falls within the scope of the Relevant Conduct Guideline can be the subject of the Cross-Reference Provision. Accordingly, we must review the Relevant Conduct Guideline to determine whether the murder here falls within its scope.

The Relevant Conduct Guideline treats as relevant conduct, including for cross-referencing purposes, the following:

> [(a)(1)] all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant . . . that occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense;

> [(a)(2)] solely with respect to offenses of a character for which § 3D1.2(d) [the "Grouping Guideline"] would require grouping of multiple counts, all acts and omissions described in subdivisions (1)(A) and (1)(B) above that were part of the same course of conduct or common scheme or plan as the offense of conviction; [and]

> [(a)(3)] all harm that resulted from the acts and omissions specified in subsections (a)(1) and (a)(2) above, and all harm that was the object of such acts and omissions . . . .

USSG § 1B1.3.

As is obvious from its text, Subsection (a)(1) of the Relevant Conduct Guideline requires a closer connection between

the acts and omissions committed and the offense of conviction than does Subsection (a)(2), which encompasses a broader group of acts. *United States v. Johnson*, 347 F.3d 635, 640 (7th Cir. 2003) ("Subsection (a)(2) allows a court to consider a broader range of conduct than does the trailing clause of (a)(1). USSG § 1B1.3, cmt. background."). As a counterbalance to this broader scope, however, Subsection (a)(2) has a threshold limitation on its applicability, *i.e.*, it is applicable "solely with respect to offenses of a character for which [the Grouping Guideline] would require grouping of multiple counts." USSG § 1B1.3(a)(2).

Notably, the Government does not contend that the August 17, 2007 robbery and murder would fall within Subsection (a)(1) of the Relevant Conduct Guideline.[13] Thus, we look here only to whether the murder falls within Subsection (a)(2) which, by its express terms, requires reference to the Grouping Guideline, USSG § 3D1.2.

The Guidelines Commentary explains the interplay and purpose of the reference to the Grouping Guideline in Subsection (a)(2) as follows:

> Subsection (a)(2) provides for consideration of a broader range of conduct with respect to one class of offenses, primarily certain property, tax, fraud and drug offenses for which the guidelines depend substantially on quantity, than with respect to other offenses such as assault, robbery and burglary. The distinction is made on the basis of § 3D1.2(d), which provides for grouping together (*i.e.*, treating as a single count) all counts charging offenses of a type covered by this subsection. . . .

---

[13]Indeed, there is no basis apparent from the record for concluding that the August 17, 2007 offense was an act that occurred "during the commission of the offense of conviction, in preparation for it, or in the course of attempting to avoid detection or responsibility for the offense of conviction," as required for Subsection (a)(1) to apply.

> Subsections (a)(1) and (a)(2) adopt different rules because offenses of the character dealt with in subsection (a)(2) (*i.e.*, [groupable offenses under the Grouping Guideline]) often involve a pattern of misconduct that cannot readily be broken into discrete, identifiable units that are meaningful for purposes of sentencing. . . .

USSG § 1B1.3, cmt. background.

For purposes of this opinion, two aspects of the Grouping Guideline are significant: (1) it requires that felon-in-possession offenses be grouped; and (2) it specifically forbids the grouping of homicide offenses and other violent offenses. *See* USSG § 3D1.2(d) (grouping is required for offenses covered by § 2K2.1 and excluded from grouping are "all offenses in Chapter Two, Part A (except § 2A3.5)," which includes the Guideline for murder, § 2A1.1). While the parties agree on these two principles, clear from the text of the Grouping Guideline itself, they differ on how to apply these principles in this case. There is also a circuit split as to how to properly apply the Grouping Guideline when determining cross-references for murder or other violent offenses.

The Government's explanation as to why the murder cross-reference should apply (and the rationale in the PSR adopted by the district court) can be stated as follows. First, the defendant's unlawful possession of a firearm on August 17, 2007 during the robbery and murder, is groupable with the offense of conviction because both are felon-in-possession offenses. Thus, according to the Government, the procedural trigger of groupability, necessary for Subsection (a)(2) of the Relevant Conduct Guideline to apply, is satisfied. Second, the substantive requirement in Subsection (a)(2) that the two offenses be "part of the same course of conduct or common scheme or plan" is also satisfied. Third, the murder which occurred during the August 17, 2007 relevant conduct offense, is likewise relevant conduct pursuant to Subsection (a)(3) of the Relevant

Conduct Guideline, which includes "all harm that resulted from the acts . . . specified in [Subsection (a)(2)]."

Not surprisingly, Horton disagrees. He argues instead that the pertinent offenses for determining groupability are the offense of conviction (the August 10 felon-in-possession charge) and the offense for which the cross-reference is being applied, which in this case is murder. Because a murder offense is specifically not subject to grouping, Horton contends that the procedural trigger for application of Subsection (a)(2) of the Relevant Conduct Guideline—*i.e.*, groupability of the two offenses—is not satisfied. Accordingly, Subsection (a)(2) cannot be utilized to render the August 17, 2007 incident relevant conduct. And, as noted, the Government does not argue that the murder is relevant conduct under Subsection (a)(1).[14]

There is a circuit split in the threshold issue as to whether only the offense of conviction need be a groupable offense or whether *both* the offense of conviction *and* the relevant conduct offense (the cross-referenced offense) must be groupable offenses in order to apply Subsection (a)(2). Notably, all but one of the circuits to have squarely addressed the issue have adopted Horton's view that both must be groupable. *See, e.g.*, *United States v. Williams*, 431 F.3d 767, 772-73 & n.9 (11th Cir. 2005) (concluding that where conviction was for a violation of 18 U.S.C. § 922(g), the district court erred in utilizing an assault with a different firearm as relevant conduct, because assault is excluded from being grouped, and thus "the definition of relevant conduct found in § 1B1.3(a)(2) is not available to the Government"); *United States v. Settle*, 414

---

[14]Horton argues, alternatively, that even if the Government is correct that the offenses that must be grouped are the two separate instances of Horton possessing a gun as a felon, the second incident (including the murder) is not relevant conduct because it does not satisfy Subsection (a)(2)'s requirement that it be "part of the same course of conduct or common scheme or plan as the offense of conviction." In light of our holding, we do not reach this issue.

F.3d 629, 632 n.2 (6th Cir. 2005) (attempted murder is not groupable and thus could not be relevant conduct under Subsection (a)(2) in case where charge of conviction was felon-in-possession of a firearm); *United States v. Jones*, 313 F.3d 1019, 1023 & n.3 (7th Cir. 2002) (although holding that the Cross-Reference Provision in § 2K2.1 was appropriately applied to a murder that was relevant conduct under Subsection (a)(1), observing the murder would not be relevant conduct under Subsection (a)(2) because "the homicide charge is specifically excluded" from the Grouping Guideline); *United States v. Levario-Quiroz*, 161 F.3d 903, 906 (5th Cir. 1998) (in applying the Cross-Reference Provision, defendant's acts of assault with attempt to commit murder and attempted murder were not "relevant conduct" under Subsection (a)(2) because, although they were part of the same course of conduct as the offense of conviction, "they were not offenses of a character for which [USSG §] 3D1.2(d) would require grouping"). *But see United States v. Kulick*, 629 F.3d 165, 170-71 & n.4 (3d Cir. 2010) (concluding that only the offense of conviction need be subject to grouping).

In *Jones*, the Seventh Circuit addressed—and rejected—the precise analysis proposed by the Government here:

> It was additionally argued that consideration of the armed robbery/felony murder as relevant conduct was appropriate under guideline § 1B1.3(a)(2), which includes within its definition of "relevant conduct" "all acts and omissions . . . that were part of the same course of conduct or common scheme or plan as the offense of conviction," but only with respect to offenses for which grouping under § 3D1.2(d) would be required. Grouping would not be required in this case-in fact, grouping of the felon in possession count with the homicide charge is specifically excluded from the operation of § 3D1.2(d)—rendering § 1B1.3(a)(2)'s relevant-conduct definition inapplicable here.

313 F.3d at 1023 n.3.[15] As noted, the other circuits cited above agree.

The Third Circuit has held to the contrary. *Kulick*, 629 F.3d at 170-71 & nn.4-5 (holding pursuant to the binding prior panel decision of *Jansen v. United States*, 369 F.3d 237, 248 (3d Cir. 2004), Subsection (a)(2) is applicable "when the offense of conviction is a groupable offense, regardless of the nature of the alleged relevant conduct"). Notably, however, the *Kulick* court embraced its holding with little enthusiasm, instead stating that, if it were not bound by *Jansen*, "an argument might be made that we should not apply [Subs]ection (a)(2) on these facts . . . ." *Id.* at 170 n.4. The *Kulick* court also "le[ft] for another day whether to recommend en banc consideration of whether *Jansen*'s effect should be limited to drug offenses or to those cases in which the offense of conviction has a higher offense level than the alleged relevant conduct." *Id.*

Now squarely faced with the same issue as our sister circuits,[16]

---

[15]In *Jones*, the defendant had used the same firearm he was convicted of possessing during an armed-robbery and felony-murder incident four days prior to the offense of conviction. Although rejecting Subsection (a)(2) as a basis for finding the earlier robbery/murder incident "relevant conduct," the *Jones* Court nonetheless upheld application of the murder cross-reference under Subsection (a)(1) of the Relevant Conduct Guideline, concluding that the armed robbery/felony murder "occurred during the commission of the offense of conviction." 313 F.3d at 1021, 1023 & n.3.

[16]The Government contends that this Circuit adopted the contrary position in *Pauley*, but we disagree. Instead, we conclude that our circuit has not spoken directly on this issue. *Pauley* held that, in a drug conspiracy case, a murder cross-reference from the drug distribution Guideline, § 2D1.1(d), was appropriate under Subsection (a)(2). In so doing, the court explained:

By its terms, §1B1.3(a)(2) applies only to offenses to which [the Grouping Guideline] would require the grouping of multiple counts. . . . [The Grouping Guideline] also lists guidelines to

we agree with the conclusions of the Fifth, Sixth, Seventh, and Eleventh Circuits and hold that Subsection (a)(2) of the

> which the section applies. The offense level in drug distribution cases is, of course, determined on the basis of quantity, and § 2D1.1—the guideline containing the murder cross-reference—is specifically listed as a guideline to which [the Grouping Guideline] applies. Accordingly, the district court properly looked to § 1B1.3(a)(2) in determining the scope of "relevant conduct."

289 F.3d at 258-59.

*Pauley* is easily distinguishable on its facts. There, the offense of conviction was a drug conspiracy, and the defendant was involved in a series of four home robberies where defendant and his drug associates, usually armed with handguns, stole drugs and/or money from the homes of other drug dealers. During one of the robberies, Pauley shot and killed two residents of the home. 289 F.3d at 256-58. Based on the way the district court ruled and the parties argued the case, the *Pauley* court analyzed the cross-reference under Subsection (a)(2) of the Relevant Conduct Guideline. But the murders there likely would have been relevant conduct under Subsection (a)(1).

Moreover, a review of the briefs in *Pauley* reveals that the defendant never argued that murder had to be a groupable offense in order for the cross-reference to apply. Instead, both the parties and the *Pauley* court *assumed* that only the offense of conviction need be groupable and thus was not required to rule on the issue. The parties framed their arguments only as addressing whether the murder was "part of the same course of conduct or common scheme or plan" so as to render Subsection (a)(2) of the Relevant Conduct Guideline applicable. The defendant there simply did not argue, as Horton does here, that Subsection (a)(2) was inapplicable because murder was not a groupable offense. Thus, nothing in *Pauley* directly addressed the issue now before us. *See Brecht v. Abrahamson*, 507 U.S. 619, 631 (1993) ("[S]ince we have never squarely addressed the issue, and have at most assumed [it], we are free to address the issue on the merits."); *Webster v. Fall*, 266 U.S. 507, 511 (1925) ("Questions which merely lurk in the record, neither brought to the attention of the court nor ruled upon, are not to be considered as having been so decided as to constitute precedents."); *Fernandez v. Keisler*, 502 F.3d 337, 343 n.2 (4th Cir. 2007) ("We are bound by holdings, not unwritten assumptions."); *Getty Petroleum Corp. v. Bartco Petroleum Corp.*, 858 F.2d 103, 113 (2d Cir. 1988) ("a *sub silentio* holding is not binding precedent").

Relevant Conduct Guideline is applicable only when *both* the offense of conviction and the relevant conduct offense are capable of grouping. *See* USSG § 1B1.1 cmt. n.1(H) (defining "offenses" to "mean[s] the offense of conviction and all relevant conduct.")

We further reject the Government's argument that the relevant conduct "offense" is the second felon in possession offense occurring on August 17. As we have held above and as applied in the context of cross-references, both the offense of conviction and the cross-referenced offense must be groupable. Contrary to the Government's contention, the relevant conduct offense here is *murder*, because it was the murder offense and its Guideline that was used to set Horton's offense level, and it was the murder that the district court treated as "relevant conduct." As the Eleventh Circuit cogently explained in *Williams*:

> The Government also makes an argument that it is not the assault that would be grouped but rather the firearm used in the assault. This is not correct: § 2K2.1(c)(1) refers to another offense in which a firearm was used. Therefore, it is the other offense which must be subject to the rules regarding grouping because it is the assault guideline that is used to calculate the offense level.

431 F.3d at 772 n.9. Similarly, here it is the murder that must be groupable for Subsection (a)(2) to apply "because it is the [murder] guideline that is used to calculate the offense level," and it clearly is not. *See id.*; *Settle*, 414 F.3d at 632 n.2; *Levario-Quiroz*, 161 F.3d at 906; *Jones*, 313 F.3d at 1023 n.3.

The Government errs in treating the felon-in-possession offense as the relevant conduct offense in order to bring it within the Grouping Guideline because that analysis ignores how the cross-reference operates. Tellingly, the cross-reference does not affect the offense level by, for example,

adding a second firearm possession to the offense characteristics. Instead, it applies the offense level for murder. Because murder is excluded from the grouping rules, Subsection (a)(2) is not available to the Government to utilize the murder as the relevant conduct.[17]

For the foregoing reasons, we conclude the district court erred in applying the murder cross-reference under Subsection (a)(2). We therefore vacate Horton's sentence and remand for resentencing.[18]

## IV.   Conclusion

For the reasons set forth above, we affirm Horton's conviction, vacate his sentence, and remand for resentencing consistent with this opinion.

---

[17]Had the Government charged Horton and obtained a conviction for his August 17 possession of the firearm used in the robbery and murder of Ms. Harris, that murder likely would have qualified as relevant conduct at sentencing on the August 17 felon-in-possession charge under Subsection (a)(1) of the Relevant Conduct Guideline. *See United States v. Wright*, 594 F.3d 259, 267-69 (4th Cir. 2010).

[18]We emphasize that our holding is a narrow one, and should not be read to limit the Cross-Reference Provision only to charged conduct or conduct for which a conviction is obtained. *Grubbs*, 585 F.3d at 799 ("[a] sentencing court may consider uncharged and acquitted conduct in determining a sentence, as long as that conduct is proven by a preponderance of the evidence"). Nor do we hold that the Cross-Reference Provision is limited to conduct related to the specific weapon or weapons identified in an indictment. For example, several circuits have recognized that the Cross-Reference Provision refers to the use of "any firearm" and, as a result, the provision is not limited to just the firearm that was involved in the offense of conviction. *See* 2K2.1(c)(1); *Williams*, 431 F.3d at 770-771 ("join[ing] the Eighth and Tenth Circuits to hold that 'any firearm' truly means any firearm" and thus § 2K2.1(c)(1) can apply to firearms not named in the indictment").

*AFFIRMED IN PART,*
*VACATED IN PART,*
*AND REMANDED IN PART*

DAVIS, Circuit Judge, concurring in part and concurring in the judgment:

I concur in most of the majority opinion and in the judgment. I agree there are no grounds for vacating the conviction, for the reasons the majority explains. I also agree that the district court procedurally erred in cross-referencing the August 17, 2007, murder of Charmeka Harris. The district court should not have, and cannot on remand, rely on the Harris murder to increase Horton's advisory term of imprisonment under the Sentencing Guidelines. That conclusion, in my view, renders it entirely unnecessary and inappropriate to consider, as the majority does in section III-B, Horton's alternative ground for challenging his life sentence: whether "the district court clearly erred in finding, as a factual matter and by a preponderance of the evidence, that Horton was involved in the August 17, 2007 robbery and responsible for the murder of Ms. Harris." Maj. Op. at 19.

I.

The upshot of our conclusion that the Harris murder cannot be cross-referenced is this: the Sentencing Commission has determined that the courts generally should not tack on punishment for crimes such as the Harris murder to sentences for crimes such as Horton's prohibited possession of the .22 rifle. In essence the Commission is telling us that Horton should only be punished for his alleged involvement in the Harris murder if the government can (and does) prove, to a jury and beyond a reasonable doubt, that Horton committed the murder. Indeed, the State of North Carolina apparently had intended to take that usual route — that is, until the district court in this case elected, erroneously, to invoke the murder cross-reference and sentence Horton to life imprisonment. At

that point, the State dismissed the state charges, apparently realizing it was off the hook; it did not have to go through the effort and uncertainty of trying to prove, to a jury and beyond a reasonable doubt, that Horton was guilty of the murder.[1]

Because the murder is now irrelevant to the Guidelines calculation, the majority's election to address the sufficiency of the evidence underlying the cross-reference can be explained only by the following series of dubious assumptions: (a) the government will argue on remand that the district court should disregard the Commission's instruction to require that the Harris murder be charged and proven as a separate crime (or "relevant conduct" in relation to a separate crime); (b) the district court will foreclose the parties from submitting additional evidence on whether Horton committed the murder; (c) the district court will impose an upward variance under 18 U.S.C. § 3553(a) based on a finding that Horton committed the murder; and (d) a future panel of this court will find the hypothetical variant sentence substantively reasonable.

I do not think we should so easily assume the Commission was so obviously wrong, and I am not convinced the district court would so assume. Certainly, there is no authority for the district court to refuse reopening of the evidentiary record upon the resentencing. And, in any event, nothing this panel says about the evidence before the district court in the original sentencing could possibly bind a subsequent panel examining the evidentiary record created upon the remand for resentencing. Accordingly, the proper course would be to allow the district court to determine in the first instance (and undistracted by *dicta* from this court) whether, in its view, reliable evidence of Horton's alleged involvement in the Harris murder would justify a substantial upward variance.

---

[1]I note that whether Horton was involved in the murder was a close question on the evidence presented. The government relied entirely on hearsay, much of which was double- or triple-hearsay, largely from cooperators whose veracity could reasonably be questioned on various grounds.

## II.

The majority's election to reach out and address the evidentiary sufficiency issue also highlights a certain irony. In cases in which a criminal defendant has appealed a conviction on a particular count on both sufficiency-of-the-evidence and legal grounds, and in which there was legal error, this court regularly, and in my view erroneously, declines to decide whether the evidence was sufficient to support the conviction. *See, e.g.*, *United States v. Lawson*, 677 F.3d 629, 651 n.29 (4th Cir. 2012) (declining to address sufficiency of evidence; new trial awarded on ground of juror misconduct); *United States v. Golding*, 168 F.3d 700, 705 n.* (4th Cir. 1999) (declining to address sufficiency of evidence; new trial awarded on ground of prosecutorial misconduct); *United States v. King*, 650 F.2d 534, 535 n.2 (4th Cir. 1981) (declining to address sufficiency of evidence; new trial awarded on ground of denial of right to make closing argument in derogation of Sixth Amendment); *see also United States v. Sandalis*, 14 F. App'x 287, 291 n.7 (4th Cir. Aug. 1, 2001) (unpub.) (suggesting that sufficiency of evidence challenge would be "moot" if new trial were to be awarded on the basis of juror misconduct), *op. after remand*, 39 F. App'x 798, 804-05 (4th Cir. July 3, 2002) (unpub.) (affirming convictions after considering, *inter alia*, evidentiary sufficiency).

That course is improper. Where a defendant shows on appeal that the evidence was insufficient for the government to meet its burden of proof, we must remand for the entry of a judgment of acquittal on the count unsupported by substantial evidence (irrespective of the presence of other legal error) because subjecting the defendant to a new trial would violate the Fifth Amendment's Double Jeopardy Clause. *Burks v. United States*, 437 U.S. 1, 11 (1978). In cases where a count of conviction is tainted by legal error, we cannot fairly (or logically, I submit), decline to decide a sufficiency challenge to that count because the disposition of the appeal — remand for a new trial or remand with instructions to enter a judgment

of acquittal—turns on whether the sufficiency challenge is meritorious.

Horton's appeal of his sentence, and other such appeals, are fundamentally different than appeals of convictions such as those discussed above, because in this case the Double Jeopardy Clause does not prevent the district court from allowing the government and/or Horton to present additional evidence at Horton's re-sentencing proceeding. "[T]o the extent that the mandate of the appellate court instructs or permits reconsideration of sentencing issues on remand, the district court may consider the issue de novo, entertaining any relevant evidence on that issue that it could have heard at the first hearing." *United States v. Bell*, 5 F.3d 64, 67 (4th Cir. 1993) (internal quotation marks omitted); *cf. United States v. Gammage*, 580 F.3d 777, 779 (8th Cir. 2009) (remanding for the district court "to resentence Mr. Gammage based on the record already before it"). Indeed, the dearth of specific findings by the district court at Horton's initial sentencing hearing prevents us from discerning whether additional evidence might lead the court to reconsider its conclusion that the government met its burden of proof.[2]

Therein lies the irony of the majority's chosen course. On the one hand, in cases such as *Lawson*, *Golding*, and *King*, we expressly decline to decide whether a conviction was supported by substantial evidence, even though deciding that issue might entitle a defendant to a judgment of acquittal rather than a bare remand. On the other hand, in cases like this one, where resolving the sufficiency of the evidence supporting a legally erroneous sentencing enhancement is unnecessary to the disposition of the appeal—and where a defendant

---

[2]The full extent of the district court's explanation for why it believed the government had met its burden was this: "I think that the Government is correct and the probation officer's got it right," and "The court finds the basis for the findings contained in the presentence report credible and reliable and, therefore, the court adopts those findings." J.A. 791-92.

might well have new grounds for attacking that evidence upon resentencing—the majority uses *dicta* to give the government a "thumbs up," essentially predicting that the government will meet its burden again on remand.

For these reasons, the wise course for us would be to decline to decide whether the government mustered sufficient evidence to prove by a preponderance that Horton committed the August 2007 murder. Sometimes, *obiter dicta* is both useful and harmless. At other times, it is both useless and harmful, and thus inappropriate. This is one of those cases.

## III.

In response to this concurring opinion, the majority has inserted its footnote twelve. I confess that I am perplexed by that footnote.

It is perfectly clear that the majority has confused Horton's legal claim of evidentiary sufficiency, which is the subject matter of this concurrence, with a claim of "clear error" in the district court's factfinding, i.e., a potentially curable factfinding error under the Advisory Sentencing Guidelines.[3] Hor-

---

[3]Consequently, the majority's citation to cases in which appellate courts have remanded cases for resentencing because curable factfinding errors in the district court's application of Sentencing Guidelines enhancements or adjustments were identified, is of no moment in the context of this case. *See, e.g.*, *United States v. Llamas*, 599 F.3d 381, 388-90 (4th Cir. 2010) (guidelines enhancement vacated for inadequate findings), *aff'd after resentencing on remand*, ___ F. App'x ___, 2012 WL 1111335, (4th Cir. April 4, 2012); *United States v. Manatau*, 647 F.3d 1048, 1056 (10th Cir. 2011) ("On remand, the district court should examine what losses Mr. Manatau *intended*.") (emphasis in original); *United States v. Flores*, 640 F.3d 638, 644-45 (5th Cir. 2011) (sentence vacated where enhancement was based on district court's erroneous recitation of trial evidence); *United States v. Newman*, 614 F.3d 1232 (11th Cir. 2010).

Indeed, the last case cited by the majority, *United States v. Williams*, 527 F.3d 1235 (11th Cir. 2008), seriously cuts against its analysis. In *Wil-*

ton's brief, at pages 44-50, as an alternative argument to his principal (and dispositive) argument—the legal impropriety of the murder cross-reference—unmistakably challenges the suf-

---

*liams*, the defendant-appellant was the executive director of a Georgia non-profit organization receiving federal grant funds. She was convicted of wire fraud and federal funds theft for redirecting a portion of those grant funds to unauthorized uses. On appeal, she challenged three guidelines adjustments: (1) aggravated-role; (2) abuse-of-trust; and (3) obstruction of justice. The Eleventh Circuit sustained application of the latter adjustment but found *legal error* in the district court's application of the first two adjustments. In other words, in holding that at the resentencing after the remand the district court was flatly prohibited from reconsidering the first two adjustments, the Eleventh Circuit relied on the limited factual record before it, coupled with its legal determination, e.g., whether the husband could be deemed a participant in the scheme and whether appellant occupied a position of trust in respect to the federal grantor. *See id.* at 1249 ("Because *the evidence is insufficient* as a matter of law to show that Williams was 'an organizer, leader, manager, or supervisor of one or more other participants in criminal activity,' we conclude that the district court erred in applying the two-level aggravated-role adjustment under U.S.S.G. § 3B1.1(c)." (emphasis added)); *id.* at 1251-52 ("Because there is *no evidence* that CNCS entrusted Williams with discretionary authority or placed a special trust, akin to that of a fiduciary, in Williams, the district court erred in applying the abuse-of-trust adjustment based on Williams's relationship with CNCS. On remand, the district court shall recalculate Williams's advisory Guidelines sentence without the § 3B1.3 adjustment." (emphasis added)); *id.* at 1252 ("As to Williams's sentence, the district court's factual findings do not justify application of adjustments for aggravated role or for abuse of trust. *Therefore, we vacate Williams's sentence and remand for resentencing without the upward adjustments under U.S.S.G. §§ 3B1.1(c) and 3B1.3*." (emphasis added)).

Thus, in *Williams*, the appellate court's assessment of the factual record, in light of the controlling legal standards, prompted the court to find insufficient evidence to support two of the adjustments sought by the government and to mandate that those two adjustments were inapplicable as a matter of law; the court appropriately instructed the district court to impose a sentence upon remand without regard to those adjustments. The court did not, as the majority does here, go out of its way to signal the district court that it could resort to 18 U.S.C. § 3553(a) to achieve the same sentence of incarceration that had been imposed as a result of legal error in the calculation of the appellant's Guidelines sentencing range.

ficiency of the evidence that he was involved in the Harris murder. *See* Appellant's Brief at 44, Argument Heading ("A PREPONDERANCE OF THE EVIDENCE DID NOT SUPPORT THE CROSS-REFERENCE TO FIRST DEGREE MURDER"). It is Horton, not the majority, that has presented his issues "in their logical order." Because our resolution of the dispositive legal issue of the murder cross-reference fully disposes of the sentencing claim as the case comes to us, we should stop there.

The majority's response to this simple truth, *see* ante n.12 ("If we had concluded that the district court clearly erred in its factual determination regarding the August 17, 2007 murder, the more complicated issue of the murder cross-reference's applicability would not have been reached.") is absolutely baffling. When a "more complicated" issue is a legal issue crying out for resolution for the benefit of the district judges in this circuit and the lawyers appearing before them, it would have been a derogation of our responsibility to clarify the law for this panel to have attempted to duck that issue, no matter how "complicated."[4] And, I unhesitatingly note, the majority opinion performs that job with exquisite cogency and clarity.

Finally, the majority's reliance on *dicta* from *United States v. Susi*, 674 F.3d 278 (4th Cir. 2012), is unavailing. I do not doubt that in any case this court's mandate may expressly authorize, *see, e.g.*, *Bell*, 5 F.3d at 67, or it may expressly prohibit, *see, e.g.*, *Gammage*, 580 F.3d at 779, a district court's reopening of the factual record upon a remand for resentencing. It is the mandate that is the sole authority for such cabining of a district court's authority. In any event, as *Susi* made

---

[4]As the docket of this case shows, acting *nostra sponte* barely three weeks before oral argument, we ordered counsel to file supplemental briefs on the guideline cross-reference issue. This action was entirely in keeping with the high importance of that issue, which is nicely resolved in the majority opinion.

perfectly clear, that case was decided on the basis of *harmless error*, not the *absence of error*; thus, it has no salience here. *See Susi*, 674 F.3d at 283 ("We need not resolve whether the district court erred in concluding that it was barred from reconsidering the Sentencing Guidelines calculation, because even if we assume that the district court erred in this respect, that error was harmless under the facts of this case.").

\* \* \*

In sum, we should say no more than is needed in this case.