**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 22-4554**

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

JOSEPH DUK-HYUN LAMBORN, a/k/a Joe Yu, a/k/a Trigg,

Defendant - Appellant.

**No. 22-4555**

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

YOUNG YOO, a/k/a YG,

Defendant - Appellant.

**No. 22-4556**

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

PETER LE, a/k/a Savage, a/k/a Loki, a/k/a Lorton King,

             Defendant - Appellant.

―――――――――――

**No. 22-4560**

―――――――――――

UNITED STATES OF AMERICA,

             Plaintiff - Appellee,

      v.

TONY MINH LE, a/k/a Sneaks, a/k/a Sneaky, a/k/a T, a/k/a Tiger,

             Defendant - Appellant.

―――――――――――

Appeal from the United States District Court for the Eastern District of Virginia, at Alexandria.  Liam O'Grady, Retired District Judge.  (1:19−cr−00057−LO−5)

―――――――――――

Argued:  September 26, 2025                    Decided:  November 18, 2025

―――――――――――

Before DIAZ, Chief Judge, GREGORY, Circuit Judge, and KEENAN, Senior Circuit Judge

―――――――――――

Affirmed in part, vacated in part, and remanded by published opinion.  Chief Judge Diaz wrote the opinion, in which Judge Gregory and Judge Keenan joined.

―――――――――――

**ARGUED:**  Robert James Wagner, ROBERT J. WAGNER PLC, Richmond, Virginia; Eric Joseph Brignac, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Raleigh, North Carolina; Gerald Thomas Zerkin, Richmond, Virginia; Lana Manitta, LAW OFFICE OF LANA MANITTA, PLLC, Alexandria, Virginia, for Appellants.  Jacqueline Romy Bechara, OFFICE OF THE UNITED STATES ATTORNEY, Alexandria, Virginia, for

2

Appellee. **ON BRIEF:** G. Alan DuBois, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Raleigh, North Carolina, for Appellant Joseph Duk-Hyun Lamborn. Erik S. Siebert, United States Attorney, James L. Trump, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Alexandria, Virginia, for Appellee.

———————

DIAZ, Chief Judge:

This appeal arises from a joint criminal trial involving members of the Reccless Tigers gang.  The district court sentenced Joseph Lamborn, Young Yoo, and Peter Le ("Peter") to life imprisonment for a slew of offenses, which we'll discuss in more detail later.  The district court also sentenced Tony Le ("Tony") to 312 months' imprisonment for racketeering conspiracy and drug conspiracy.

Defendants appeal their convictions and sentences on various grounds, but only one challenge has merit.  We vacate Lamborn, Yoo, and Peter's sentences and remand for the district court to correct inconsistencies between its oral sentences and written judgments. We otherwise affirm.

## I.

Because the government prevailed at trial, we recount the facts in the light most favorable to it.  *See United States v. Dennis*, 19 F.4th 656, 660 (4th Cir. 2021).

### A.

The Reccless Tigers is a Northern Virginia-based drug gang.  It primarily deals in marijuana and cocaine.  The gang takes drug debts seriously: members often target individuals who don't pay their debts or who are perceived as cooperating with law enforcement.

Over time, the Reccless Tigers developed two offshoots: Tiger Side, which promised members "more money and more drugs," and Club Tiger, which served as a "prospect

group" for younger members. J.A. 3285–86, 3970. Membership in the three groups was often fluid.

Lamborn was one of the first members of the Reccless Tigers. Yoo was involved in the gang's drug operations. And Tony and Peter led Tiger Side and Club Tiger, respectively. Tony was also affiliated with the Asian Boyz, a California-based gang with close ties to Tiger Side.

### B.

Brandon White first crossed paths with the Reccless Tigers in high school. Yoo fronted him marijuana to sell, and White still owed Yoo a drug debt years later. One night, another member of the gang, David Nguyen, assaulted White for failing to pay his debt. Police arrested Nguyen for the assault, and White testified against him at a preliminary hearing.

Lamborn, Yoo, and Peter later enacted a plan to "fuck[] up" White for "snitching." J.A. 3101, 3044. Two of White's friends agreed to drive White to a parking lot in exchange for Peter paying off their drug debts.

Two cars waited for White in the parking lot: Lamborn and Peter were in one, and Yoo was in the other. Lamborn and Peter then wrestled White into their car.

The two cars drove to Richmond, Virginia. They stopped at a neighborhood roundabout adjacent to some woods. Lamborn and Peter took White into the woods, where Yoo soon joined them. Witnesses heard gunshots. Lamborn, Peter, and Yoo then returned without White.

5

Lamborn later told two other gang members that he shot White. And Yoo told another gang member that he stabbed White with a knife he received from Peter. Yoo then gave another gang member a suitcase of clothes and a knife to dispose of.

Lamborn later returned to Richmond with two other gang members to move White's body, but they gave up and left the body wrapped in a tarp in the woods.

C.

1.

In August 2019, before law enforcement found Brandon White's body, a grand jury charged Lamborn, Yoo, Peter, and Tony (along with other members of the Reccless Tigers) with conspiring to distribute narcotics and other crimes related to drug trafficking.[1] The district court set trial for February 2020, but it continued the case to allow the government to investigate new charges.

After finding White's body and investigating his death, the government obtained a superseding indictment in August 2020. The grand jury again charged all four Defendants with drug conspiracy. It also charged three of them—Lamborn, Yoo, and Peter—with racketeering conspiracy, kidnapping conspiracy, kidnapping resulting in death, murder in aid of racketeering, killing while engaged in drug trafficking, and discharging a firearm resulting in death. And for Tony, who was not involved in White's murder, it added new

---

[1] This was the third superseding indictment in the case. Earlier indictments brought fewer charges against fewer defendants.

6

charges for racketeering conspiracy and possessing a destructive device in furtherance of a drug trafficking crime (for alleged involvement in unrelated firebomb attacks).

### 2.

Over the next two years, the district court continued the trial three more times. The COVID-19 pandemic limited defense counsel's ability to visit their clients, so the district court repeatedly pushed the trial date to allow them more time to prepare. The court also continued the case because of the volume of discovery.

In May 2021, Tony moved to dismiss the indictment, alleging that the delays violated his rights under the Speedy Trial Act and Sixth Amendment. The district court denied the motion.[2] The court justified the delays given the complexity of the case, high volume of discovery, and defense counsel's restricted access to their clients during the pandemic.

In April 2022, the week before trial was set to begin, Lamborn's attorneys moved—at Lamborn's request—to withdraw as counsel. The district court denied the motion on timeliness grounds and because counsel didn't "demonstrate irreconcilable differences" that would impede their ability to meaningfully defend Lamborn. J.A. 4865.

Four days before trial, Defendants jointly moved for another continuance, arguing that they required more time to review a recent and large discovery production. The district court also denied that motion, and trial began on April 11, 2022.

---

[2] More specifically, the district court rejected Tony's claim under the Speedy Trial Act. We address the court's failure to rule on the Sixth Amendment claim later.

7

D.

Although Lamborn's attorneys put on most of his defense, he eventually fired them, continued pro se, and made his own closing argument to the jury.

Yoo and Peter each moved for a judgment of acquittal under Rule 29 of the Federal Rules of Criminal Procedure, both of which the district court denied.

The jury ultimately found Lamborn, Yoo, and Peter guilty of racketeering conspiracy, murder in aid of racketeering, kidnapping conspiracy, kidnapping resulting in death, drug conspiracy, and killing while engaged in drug trafficking. Only Lamborn was convicted of using a firearm resulting in death. The jury also found Peter guilty of maintaining drug-involved premises, distributing marijuana and cocaine, possessing a firearm during a drug trafficking offense, and money laundering conspiracy.

Lamborn, Yoo, and Peter each received life sentences, plus several years of supervised release.

The jury found Tony guilty of racketeering conspiracy and drug conspiracy, but it acquitted him of the destructive device charges. It also found that Tony conspired to distribute 1,000 kilograms or more of marijuana and 500 grams or more of cocaine.

But in Tony's presentence investigation report, the probation officer attributed fifteen kilograms of cocaine to him.

During sentencing, the district court adopted the report's recommendation and allocated fifteen kilograms of cocaine to Tony. The court also applied several sentencing enhancements, including for Tony's leadership role, possession of a firearm, and use of violence. It then sentenced him to 312 months in prison.

8

II.

We start with Defendants' request for a continuance the week before trial.

A.

We review the denial of a continuance for abuse of discretion. *United States v. Williams*, 445 F.3d 724, 739 (4th Cir. 2006). Because we afford district courts "broad discretion" on continuances, "only an unreasoning and arbitrary insistence upon expeditiousness in the face of a justifiable request for delay" is an abuse of discretion. *Morris v. Slappy*, 461 U.S. 1, 11–12 (1983) (citation modified).

And even if a district court abuses its discretion, a defendant must prove that "the error specifically prejudiced [his] case in order to prevail." *United States v. Hedgepeth*, 418 F.3d 411, 419 (4th Cir. 2005). "Not every restriction on counsel's time or opportunity to investigate or to consult with his client or otherwise to prepare for trial violates a defendant's Sixth Amendment right to counsel." *Morris*, 461 U.S. at 11. Consequently, more than a "general allegation of 'we were not prepared' is necessary to demonstrate prejudice." *United States v. LaRouche*, 896 F.2d 815, 825 (4th Cir. 1990).

B.

We conclude that the district court didn't abuse its discretion because it provided a reasonable explanation for denying the continuance. We also affirm because Defendants failed to show prejudice.

9

1.

Defendants filed their motion four days before trial, asserting that they needed more time to review the large volume of discovery the government had produced. By then, the district court had continued the trial four times for COVID-19 and various other issues.

The district court recognized that the government's discovery productions were voluminous. Still, the court denied the continuance because "[t]he vast majority of the evidence [was] available to the Defendants' counsel for the last year," and defense counsel had "ample opportunity to familiarize themselves with the facts and theories of the case as well as meet with their clients." J.A. 756–57.

Furthermore, by this point the government had produced *Jencks* material and identified cooperating witnesses. So the court found that a continuance would risk the safety of witnesses, particularly since the case involved the murder of someone who had testified against the gang. These explanations are far from "unreason[ed]," and the court's previous continuances show that it didn't arbitrarily insist on speed. *See Morris*, 461 U.S. at 11–12.

Other facts support the district court's ruling. First, the bulk of the recent discovery production wouldn't take much time to review because it wasn't relevant to the overt acts in the indictment. And while the material produced was voluminous, the government had complied with the district court's discovery order. Moreover, the government and the coordinating discovery attorney assured the district court that they would reorganize the new productions to streamline defense counsel's review.

10

2.

In any event, Defendants can't show prejudice. They haven't identified any specific piece of evidence that would have changed the result at trial had they reviewed it sooner.

Defendants claim that the expert report from the government's forensic anthropologist was buried within the large discovery production, so they didn't consult a counter-expert. But the government disclosed the forensic anthropologist months earlier, so defense counsel should have anticipated the need to retain their own expert no matter when the final report was available.

Nor do Defendants explain how learning about the expert report any earlier would have changed the result at trial. Peter's lawyer successfully cross-examined the forensic anthropologist, and Defendants don't "point to specific instances of shortfall in their lawyers' cross-examination that was flawed due to the denial of the continuance." *LaRouche*, 896 F.2d at 825; *see also Williams*, 445 F.3d at 739 ("While a defense attorney can always make good use of additional time to prepare for trial, the thoroughness of [defense counsel's] cross-examination . . . confirms that the district court was correct in its assessment of the time needed to prepare.").

Absent evidence of prejudice, we decline to reverse the district court's ruling on the motion to continue.

III.

We turn next to Lamborn's request for new counsel.

11

A.

We review the denial of a motion to substitute counsel for abuse of discretion. *United States v. Horton*, 693 F.3d 463, 466 (4th Cir. 2012). We consider "(1) the timeliness of the motion; (2) the adequacy of the court's subsequent inquiry; and (3) whether the attorney/client conflict was so great that it had resulted in [a] total lack of communication preventing an adequate defense." *United States v. Smith*, 640 F.3d 580, 588 (4th Cir. 2011).

We also keep in mind that "[t]he district court is far better situated than we are to observe and inquire into the state of the relationship between a defendant and his appointed counsel." *Id.* at 590. Thus, "where the district court has met its obligation to inquire thoroughly into the factual basis of defendant's dissatisfaction, . . . we apply the ordinary standard of review to its factual findings: clear error." *Id.* (citation modified). And even if the district court abused its discretion, we will affirm if the error was harmless. *See Horton*, 693 F.3d at 467.

B.

We hold that the district court didn't abuse its discretion when it denied the withdrawal motions. And even if it did, any error was harmless.

1.

Turning to the first *Smith* factor, the motions for withdrawal—filed only four business days before the trial date—were untimely. *See United States v. Blackledge*, 751 F.3d 188, 194 (4th Cir. 2014). The district court reasonably concluded that newly appointed counsel would struggle to adequately prepare a defense in the limited time allotted.

12

The second *Smith* factor instructs us to consider the adequacy of the district court's inquiry into Lamborn's dissatisfaction. 640 F.3d at 588. The district court held a lengthy hearing on the motion and allowed Lamborn to explain his reasons for requesting new counsel, which weighs in favor of affirming the district court's order. *See United States v. Muslim*, 944 F.3d 154, 165 (4th Cir. 2019).

Lamborn cited two points of dissatisfaction: (1) his belief that his attorneys weren't providing him with enough discovery to review, and (2) his frustration that counsel sometimes went long stretches without visiting him.

But the district court found that a protective order in the case limited the discovery Lamborn's attorneys could share with him, and that much of the remainder was irrelevant to Lamborn's defense. And while the court acknowledged that COVID-19 restrictions had limited counsel's ability to visit Lamborn, it found that Lamborn's attorneys still spent considerable time preparing for trial.

Lamborn also told the court that three months earlier, after a long stretch without communication from his lawyers, he asked his sister to text his attorneys and tell them to withdraw. The attorneys instead attempted to repair the relationship by visiting Lamborn "almost every week." J.A. 734.

Lamborn now claims that if his attorneys had moved to withdraw when he first asked, the motions would have been timely. And he argues that if the district court had inquired more thoroughly into this timeline, it would have found a breakdown in attorney-client communication severe enough to warrant new counsel.

13

The government counters that the second *Smith* factor considers the court's inquiry into a defendant's dissatisfaction with his lawyer, not on the timeliness of the withdrawal motion. Since Lamborn never specifically claimed that he was dissatisfied with his counsel because they failed to withdraw earlier, the government contends the court wasn't required to clarify the timeline.

We generally agree with the government that a court's inquiry into the timeliness of a withdrawal motion and its inquiry into a defendant's dissatisfaction are not the same. But Lamborn explained that his lawyers' lack of communication contributed to his dissatisfaction. If his attorneys ignored an ongoing request for new counsel for months, that relates to his overarching source of dissatisfaction.

The bigger issue for Lamborn is that in his own telling, his attorneys visited him nearly every week after receiving his sister's text. While Lamborn insists he still wanted at least one of his attorneys removed, he didn't pursue the matter at any of those weekly meetings. Lamborn's counsel said that they didn't receive another definitive request to withdraw until the week before trial, and Lamborn acknowledged that was true.

On this record, we needn't inquire further: it was reasonable for the district court to find that Lamborn withdrew his initial request after his attorneys started visiting more often.

2.

Since we agree that the district court adequately inquired into the basis for Lamborn's dissatisfaction, we review its factual findings on the breakdown of attorney-client communication for clear error. *Smith*, 640 F.3d at 590. We discern no such error in

14

the court's conclusion that Lamborn's conflict with his attorneys didn't prevent them from "mounting an adequate defense." *Id.* at 588.

The district court reviewed time sheets from Lamborn's attorneys and was satisfied that they were working diligently toward trial. So this isn't a case where defense counsel failed to engage in "basic trial preparation." *Blackledge*, 751 F.3d at 197; *see also United States v. Mullen*, 32 F.3d 891, 896–97 (4th Cir. 1994) (finding ineffective assistance where counsel and defendant had "no contact whatsoever" leading up to trial, and the attorney hadn't been "able to do any work" on the case).

And while Lamborn's attorneys could have communicated more often with him, Lamborn acknowledged that he was able to talk with them about his case leading up to trial, including about potential alibi witnesses and defenses. In our view then, there wasn't a significant enough breakdown in communication to warrant appointing new counsel just days before trial. *See Smith*, 640 F.3d at 593 (no breakdown in communication where counsel continued to "provide meaningful assistance" and discussed the case with defendant at several opportunities).

### 3.

Finally, any error was harmless. *See Muslim*, 944 F.3d at 165. Our harmlessness analysis turns on whether Lamborn's attorneys "provided an adequate defense" at trial. *Horton*, 693 F.3d at 467. The record shows that they did.

Indeed, Lamborn hasn't argued that his attorneys performed deficiently at trial or otherwise provided an inadequate defense. Instead, he claims that toward the end of trial, he almost physically attacked his attorney and continued pro se, which prejudiced his

15

defense. While this might be evidence of a later breakdown in the attorney-client relationship, it doesn't say anything about the effectiveness of Lamborn's lawyers before then.

## IV.

Yoo and Peter next argue that there was insufficient evidence to convict them of kidnapping conspiracy, kidnapping resulting in death, murder in aid of racketeering, and killing while engaged in drug trafficking. We disagree.

## A.

We review the denial of a Rule 29 motion de novo. *United States v. Alerre*, 430 F.3d 681, 693 (4th Cir. 2005). Defendants challenging the sufficiency of evidence "face[] a heavy burden." *United States v. Dennis*, 19 F.4th 656, 665 (4th Cir. 2021). The jury's verdict must be upheld if, viewing the evidence in the light most favorable to the government, it is supported by "evidence that a reasonable finder of fact could accept as adequate and sufficient to support a conclusion of a defendant's guilt beyond a reasonable doubt." *United States v. Burgos*, 94 F.3d 849, 862 (4th Cir. 1996) (en banc).

On appeal, we can't "weigh the evidence or review the credibility of the witnesses," and "where the evidence supports differing reasonable interpretations, the jury decides which interpretation to believe." *United States v. Perry*, 335 F.3d 316, 320 (4th Cir. 2003) (citation modified).

16

B.

1.

We begin with the convictions for kidnapping conspiracy and kidnapping resulting in death.  To establish the latter, the government was required to prove "(1) that the victim was seized, confined, inveigled, decoyed, kidnapped, abducted or carried away; (2) that the victim was held; (3) that the victim was transported interstate; and (4) that death resulted." *United States v. Lentz*, 524 F.3d 501, 512 (4th Cir. 2008).

As to kidnapping conspiracy, the government had to separately prove "an unlawful agreement to commit an offense, the defendant's knowing and willing participation, and an overt act in furtherance of the conspiracy." *United States v. Camara*, 908 F.3d 41, 46 (4th Cir. 2018).  A defendant's "mere presence at the scene of the crime" is insufficient to prove conspiracy. *United States v. Love*, 767 F.2d 1052, 1059 (4th Cir. 1985).

But the government could show that Yoo and Peter were knowing participants through evidence concerning their "relationship with other members of the conspiracy, the length of this association, their attitude, conduct, and the nature of the conspiracy." *Dennis*, 19 F.4th at 669 (citation modified).  And "conspirators need not know all of the details of the conspiracy, provided they know its essential object." *Id.* at 670 (citation modified).

2.

Yoo and Peter contend that they didn't play any role in White's kidnapping or the underlying conspiracy.  But the evidence proves otherwise.

Fahad Abdulkadir, a member of the Reccless Tigers with his own drug debt, testified that Peter told him that he and his friend, Abdullah Sayf, would have their debts forgiven

17

if they brought Brandon White to see Peter. Abdulkadir also testified that Peter helped him secure a car to transport White to the parking lot.

Kevin Aagesen, another Reccless Tigers member, overheard Yoo and Peter talking about a plan to "set up" White at a parking lot to "get fucked up." J.A. 3100–01. The plan involved splitting up into two cars and driving to a parking lot where White would be waiting. Aagesen explained that the gang targeted White because he owed Yoo money.

Abdulkadir and Aagesen testified that when Peter arrived at the parking lot, he got out of his car wearing latex gloves and wrestled White into his car. Yoo and Peter then drove off on the interstate in separate cars. Yoo called Peter's car to confirm the next meetup location, indicating he wasn't a passive participant.

Yoo and Peter argue that the more plausible story is that Abdulkabir and Sayf devised and executed the plan to kidnap White on their own. But at this stage, we can't indulge "quarrels over witness credibility," and "'potentially innocent' alternative explanations cannot sustain a sufficiency challenge." *Dennis*, 19 F.4th at 666, 670 (citation modified). Rather, we must assume the jury "resolved all contradictions in testimony in favor of the government." *United States v. Freitekh*, 114 F.4th 292, 308 (4th Cir. 2024) (citation modified).

Viewing the evidence in the light most favorable to the government, a jury could reasonably find that Yoo and Peter actively participated in both the conspiracy to kidnap White and the substantive kidnapping offense.

18

C.

1.

The government also prosecuted Yoo and Peter for murder in aid of racketeering under an aiding and abetting theory. The government had to prove that (1) there was an enterprise; (2) the enterprise was engaged in racketeering activity; (3) the defendant committed a murder; (4) the murder violated state or federal law; and (5) the murder was committed for a pecuniary purpose or for the purpose of gaining entrance to or maintaining or increasing position in the enterprise. *United States v. Ortiz-Orellana*, 90 F.4th 689, 701 (4th Cir. 2024).

Yoo and Peter aided and abetted the murder if they "knowingly associated [themselves] with and participated in the criminal venture, which requires evidence that [they] shared in [the perpetrator's] criminal intent." *United States v. Williams*, 342 F.3d 350, 357 (4th Cir. 2003) (citation modified). There must be evidence of active participation: a defendant's "mere presence at the scene of the crime" is insufficient. *Love*, 767 F.2d at 1059.

2.

Viewing the evidence in the light most favorable to the government, we find ample evidence to support the convictions.

A gang member saw Yoo bring a gun with him in the car on the way to abduct White. Once Defendants arrived in Richmond, Peter and Lamborn forced White into the woods, and Yoo joined them shortly after. Lamborn told Peter and Yoo to run away, but they chose

19

to stay with him.  Witnesses heard gunshots, and Defendants soon emerged from the woods without White.  Yoo then put his gun inside a trash bag before leaving Richmond.

Spencer Pak, another Reccless Tiger, testified that Yoo said Peter gave him a knife in the woods, which he used to stab White.  Yoo later gave another gang member a suitcase of clothes and a knife to dispose of.  White's body also had "sharp force injuries," consistent with being stabbed, in addition to gunshot wounds.  J.A. 3788–91.

Yoo argues that we shouldn't credit Pak's testimony about the knife because it was inconsistent with other witness testimony.  But, again, we can't review the credibility of witnesses on appeal.  *Dennis*, 19 F.4th at 666.  The jury was entitled to rely on Pak's testimony.  *See id.* at 667 (noting that even the "uncorroborated testimony of one witness . . . may be sufficient to sustain a conviction") (citation modified).

Defendants also insist that the evidence at trial was insufficient because "no one witnessed what actually took place in the woods."  Appellant's Br. at 42.  But "[a] conviction may rest entirely on circumstantial evidence."  *Dennis*, 19 F.4th at 665.

Based on witness testimony, the jury could have reasonably found that Peter supplied Yoo with a knife and that Yoo stabbed White.  At the very least, the jury could have found that Yoo and Peter shared Lamborn's intent to murder White because they chose to remain in the woods even after Lamborn warned them he planned to shoot White.  *See Williams*, 342 F.3d at 357.

20

D.

1.

Yoo and Peter's final challenge is to their convictions for killing while engaged in drug trafficking. The relevant statute prohibits a person from (1) intentionally killing, or counseling, commanding, inducing, procuring, or otherwise causing the intentional killing of an individual, while (2) engaging in or working in furtherance of a continuing criminal enterprise. 21 U.S.C. § 848(e)(1)(A).

There must be some nexus between the murder and the drug conspiracy; the two can't merely be a "temporal coincidence." *United States v. Hager*, 721 F.3d 167, 185 (4th Cir. 2013). The nexus requirement is satisfied where the murder has a "meaningful" connection to the drug conspiracy. *Id.* at 185–86.

2.

We affirm Yoo and Peter's convictions based on the same facts we found sufficient to affirm their other murder convictions. *See supra* at 19–20. Yoo and Peter don't dispute the nexus between White's murder and the Reccless Tigers' drug conspiracy—which they would be hard-pressed to do, considering that they targeted White for owing a drug debt and testifying against a gang member.

Consequently, it was reasonable for the jury to find that both Yoo and Peter killed White while engaged in a drug trafficking scheme.

21

V.

We next consider Tony's Speedy Trial Act and Sixth Amendment arguments.

A.

Under the Speedy Trial Act, a defendant's trial must "commence within seventy days" from either the filing date of the indictment or the date the defendant first appears before a judicial officer, whichever occurs later. 18 U.S.C. § 3161(c)(1). If more than seventy days of non-excusable delay elapse before the trial begins, the indictment "shall be dismissed on motion of the defendant." *Id.* § 3162(a)(2).

Certain delays are excusable under the Act and don't count toward a defendant's speedy trial clock. *United States v. Pair*, 84 F.4th 577, 582 (4th Cir. 2023). Two such exceptions are relevant here.

The first is any period of delay "resulting from a continuance granted by any judge . . . if the judge granted such continuance on the basis of his findings that the ends of justice served by taking such action outweigh the best interest of the public and the defendant in a speedy trial." 18 U.S.C. § 3161(h)(7)(A).

When evaluating whether such an "ends-of-justice continuance" is warranted, district courts should consider whether the failure to continue the case would "result in a miscarriage of justice," "whether the case is complex or unusual," or "whether counsel need additional time to prepare effectively." *Pair*, 84 F.4th at 583–84 (citation modified); *see also* 18 U.S.C. § 3161(h)(7)(B).

Importantly, this exception doesn't apply "unless the court sets forth, in the record of the case, either orally or in writing, its reasons for finding" that the continuance is

22

warranted. 18 U.S.C. § 3161(h)(7)(A). These findings must be on the record by the time the court rules on the defendant's motion to dismiss. *See Zedner v. United States*, 547 U.S. 489, 507 (2006).

The second relevant exception under the Act is for a "reasonable period of delay when the defendant is joined for trial with a codefendant as to whom the time for trial has not run and no motion for severance has been granted." 18 U.S.C. § 3161(h)(6). We've interpreted this provision "to make an exclusion for one defendant applicable to all defendants." *United States v. Carey*, 746 F.2d 228, 231 (4th Cir. 1984).

We review the district court's decision to exclude time under the Act de novo. *Pair*, 84 F.4th at 582. We review its factual findings for clear error. *Id.*

1.

There are two relevant periods of delay for Tony's Speedy Trial Act claim: (1) approximately eighteen months for the drug conspiracy charge, and (2) approximately eight months for the racketeering conspiracy charge.

We recently clarified that "the filing of a superseding indictment does not reset the speedy-trial clock for offenses charged, or required to be joined with those charged, in the original indictment." *United States v. Myrick*, 150 F.4th 308, 314 (4th Cir. 2025) (citation modified). But "when a superseding indictment adds new and different charges to the case—charges not required by the Double Jeopardy Clause to be included with the original charge—the clock for *those* charges is tied to the filing of the superseding indictment, not the original indictment." *Id.* at 315.

23

The grand jury first charged Tony in the third superseding indictment with a single count: conspiracy to distribute drugs. He initially appeared before the court on November 19, 2019, which means that his seventy-day speedy trial clock for the drug conspiracy charge began the next day and (barring excusable delays) would have run on January 29, 2020. *See United States v. Stoudenmire*, 74 F.3d 60, 63 (4th Cir. 1996).

The fourth superseding indictment charged Tony with another crime: racketeering conspiracy.[3] Since drug conspiracy and racketeering conspiracy aren't the "same offense," the Double Jeopardy Clause didn't require the government to bring the racketeering charge earlier. *See United States v. Devine*, 40 F.4th 139, 150 (4th Cir. 2022). So under *Myrick*, Tony's speedy trial clock for the drug conspiracy charge remained the same. But he had a separate speedy trial clock for the racketeering conspiracy charge, which began on September 2, 2020 and (barring exclusions) would have run on November 11, 2020.

Tony moved to dismiss the indictment on May 23, 2021, and he didn't renew the motion after the court dismissed it. Following our sister circuits' approach, we conclude that delays that postdate the filing of a motion to dismiss under the Speedy Trial Act don't matter. *See United States v. Connor*, 926 F.2d 81, 84 (1st Cir. 1991) ("[A] motion for dismissal [under the Act] is effective only for periods of time which antedate the filing of the motion. Subsequent periods of delay, whether includable or excludable, are inconsequential."); *see also United States v. Wirsing*, 867 F.2d 1227, 1230 (9th Cir. 1989);

---

[3] The fourth superseding indictment also charged Tony with two counts of possessing a destructive device in furtherance of drug trafficking. But the jury acquitted Tony of those charges.

24

*United States v. Mayes*, 917 F.2d 457, 460 (10th Cir. 1990); *United States v. Sherer*, 770 F.3d 407, 411 (6th Cir. 2014); *United States v. Mathis*, 96 F.3d 1577, 1579 (11th Cir. 1996); *United States v. Weidenburner*, 550 F. App'x 298, 304 (7th Cir. 2013).

2.

The district court properly excluded the delays from both time periods under 18 U.S.C. § 3161(h)(7)(A), because the case was complex and the continuances were necessary to allow counsel time to adequately prepare.

Tony faults the district court for not explicitly referencing the "ends of justice" language found in § 3161(h)(7)(A) in denying the motion. But the court wasn't required to use any "magic words," so long as it put the factual findings supporting its determination on the record by the time it ruled on Tony's motion. *United States v. Hart*, 91 F.4th 732, 740 n.4 (4th Cir. 2024). That's what the court did.

The district court explained that the case was complex, particularly given the time span of the charged offenses, the number of defendants, the number of counts, the number of potential witnesses, and the voluminous amount of discovery. The court also found the delay justified because other codefendants had requested more time to prepare. Tony doesn't argue that these are invalid reasons for delaying a trial, nor could he. *See United States v. Velasquez*, 52 F.4th 133, 139 (4th Cir. 2022) ("[T]he need for effective trial preparation is substantively a valid reason for granting an ends-of-justice continuance.").

It's also "clear from the record that the court conducted the mandatory balancing contemporaneously with the granting of the continuance[s]." *Pair*, 84 F.4th at 584. For each continuance, the district court referred to the complexity of the charges, the number

25

of defendants, and the need to allow counsel adequate time to prepare, particularly amid a global pandemic. These contemporaneous justifications show that the district court wasn't inventing a post-hoc rationale when it denied Tony's motion. *See id.*

3.

Tony's delay also falls under the exception for a "reasonable period of delay" after his codefendants requested more time to prepare for trial. 18 U.S.C. § 3161(h)(6). To determine whether the delay was "reasonable," we consider "the defendant's attempts (or lack thereof) to move for severance, prejudice to the defendant, and the length of the delay." *United States v. Robinson*, 55 F.4th 390, 399 (4th Cir. 2022). The defendant must allege "particularized prejudice arising from the delay." *Id.*

Tony first asserted his speedy trial rights and requested severance at his second arraignment. By that point, he'd already agreed to a trial date outside the seventy-day window and to one continuance. The district court declined to sever his case given the complexity of the charges. Tony didn't appeal the district court's denial of severance, which weighs against him. *See United States v. Sarno*, 24 F.3d 618, 622 (4th Cir. 1994).

The length of the delay doesn't move the needle in either direction. We've recognized that a delay as long as twenty-two months could be reasonable. *See Robinson*, 55 F.4th at 399. So the eighteen-month and eight-month delays aren't per se unreasonable.

Finally, the absence of particularized prejudice weighs strongly against Tony. Tony claims that being tried alongside defendants who faced charges for kidnapping and murder prejudiced him. But this argument merely alleges prejudice arising from the joinder of cases, not the subsequent delay in getting to trial. That's not enough. *See id*.

26

The district court correctly denied Tony's motion to dismiss under the Speedy Trial Act.

## B.

Separate from the Speedy Trial Act, the Sixth Amendment guarantees the "right to a speedy and public trial" for all criminal defendants. U.S. Const. amend. VI. The Supreme Court has articulated four factors that guide our constitutional speedy trial analysis: "Length of delay, the reason for the delay, the defendant's assertion of his right, and prejudice to the defendant." *Barker v. Wingo*, 407 U.S. 514, 530 (1972).

To prevail, the defendant "must establish that on balance, [the] four separate factors weigh in his favor." *United States v. Grimmond*, 137 F.3d 823, 827 (4th Cir. 1998) (citation modified). "It will be the unusual case . . . where the time limits under the Speedy Trial Act have been satisfied but the right to a speedy trial under the Sixth Amendment has been violated." *Pair*, 84 F.4th at 589 (citation modified).

We typically review the district court's legal analysis de novo and its factual findings for clear error. *See United States v. Burgess*, 684 F.3d 445, 451 (4th Cir. 2012).

## 1.

Tony argues that we should remand on this issue because the district court failed to expressly address his Sixth Amendment argument. That's true, although it's hard to blame the court for overlooking the issue, since Tony failed to thoroughly develop it. His motion addressed only two of the four *Barker* factors, and he didn't cite any legal precedent in support of his analysis.

27

Still, we're not inclined to find that Tony forfeited his Sixth Amendment claim. So we're left to choose between conducting our own *Barker* analysis in the first instance or remanding to a different district judge.[4]

We're satisfied the first path is the correct one. Even if the district court had ruled on the Sixth Amendment issue, we would review its application of the *Barker* factors de novo. *See Burgess*, 684 F.3d at 451. While Tony argues that there aren't any factual findings for us to review, that's not right: the findings that the court made with respect to Tony's Speedy Trial Act claim overlap with several of the *Barker* factors, so we can ground our review in those facts. *See United States v. Ali*, 991 F.3d 561, 571 (4th Cir. 2021) ("On appeal, we are not limited to evaluation of the grounds offered by the district court to support its decision, but may affirm on any grounds apparent from the record.") (citation modified). And Tony doesn't dispute the other relevant facts.

So we turn to the Sixth Amendment analysis.

2.

The only *Barker* factor that favors Tony is the length of the delay. Post-accusation delay is presumptively prejudicial "as it approaches one year." *Doggett v. United* States, 505 U.S. 647, 652 n.1 (1992). And "delay as short as eight months may qualify as presumptively prejudicial." *Burgess*, 684 F.3d at 452.

---

[4] The trial, including Tony's speedy trial claim, was handled by a district court judge who has since retired from the bench.

28

But the reason for the delay favors the government, because the district court consistently gave "valid reason[s]" to support its continuances. *See Barker*, 407 U.S. at 531. The district court explained that the delays were necessary considering the complexity of the case and to allow defense counsel enough time to prepare during the pandemic. As we've already explained, these are valid reasons to delay trial. *See Pair*, 84 F.4th at 589 (the "unpredictable and unavoidable public health crisis presented by the COVID-19 pandemic" is a legitimate reason for delay); *United States v. Hall*, 551 F.3d 257, 272 (4th Cir. 2009) (the "serious, complex" nature of a conspiracy charge is an acceptable basis for delay).

Indeed, Tony didn't argue that the delays were unreasonable, beyond a conclusory statement that they were "unnecessary." J.A. 468. That single sentence isn't enough to overcome the district court's findings to the contrary, so the second *Barker* factor favors the government.

The third *Barker* factor requires us to consider "whether and how" the defendant asserted his right to a speedy trial. 407 U.S. at 531. While Tony asserted his speedy trial right, he didn't do so consistently. In fact, he didn't object to several delays, both before and after he moved to dismiss. This undercuts the claim that he always wanted a speedy trial. *See id.* at 534–35 (concluding that the defendant "did not want a speedy trial" where his counsel didn't object to continuances); *Pair*, 84 F.4th at 590 (delayed assertion of speedy trial rights weighs against Sixth Amendment violation). So this factor also favors the government.

29

Finally, we assess potential prejudice to Tony considering three interests: "(i) to prevent oppressive pretrial incarceration; (ii) to minimize anxiety and concern of the accused; and (iii) to limit the possibility that the defense will be impaired." *Barker*, 407 U.S. at 532. Of these, we give the third the most weight. *Id.*

Before the district court, Tony argued that the delay impacted his "ability to adequately investigate the facts and circumstances surrounding the alleged offenses," including his ability "to identify, locate, and interview witnesses." J.A. 468. But he failed to identify any witness that was unavailable or unable to accurately recall key events because of the delay. Nor did he point to any exculpatory evidence that was lost or unavailable because of the delay. Tony merely alleged "a generalized prejudice common to all cases and all delays," which isn't enough to support a Sixth Amendment claim. *Robinson*, 55 F.4th at 400; *see also Hall*, 551 F.3d at 272.

Tony also asserted that he was prejudiced by his pretrial detention, which "frustrate[d] his ability to meet and confer with his counsel." J.A. 468. But this is no more than a complaint about "general prison conditions" during the pandemic that made visitation difficult, which doesn't rise to the level of a Sixth Amendment violation. *See Pair*, 84 F.4th at 591. Since Tony's motion didn't make out a legally viable basis for prejudice, this factor favors the government.

On balance, three out of the four *Barker* factors cut against Tony. So we reject his Sixth Amendment claim.

30

VI.

We next consider Tony's claim that his sentence was procedurally unreasonable.

A.

We review the reasonableness of sentencing decisions for abuse of discretion. *See United States v. Pauley*, 511 F.3d 468, 473 (4th Cir. 2007). We review the district court's factual findings, including whether a particular sentencing enhancement applies, for clear error. *See United States v. Banks*, 10 F.3d 1044, 1057 (4th Cir. 1993).

B.

Tony first takes issue with the district court's consideration of acquitted conduct.

The jury found that Tony conspired to distribute 1,000 kilograms or more of marijuana and 500 grams or more of cocaine. But the presentence investigation report attributed fifteen kilograms of cocaine to him. The district court adopted the higher drug weight at sentencing, and it calculated Tony's base offense level as 32.

The jury also acquitted Tony of the destructive device charges, but the district court referenced that conduct when it applied a two-level sentencing enhancement for use of violence under U.S.S.G. § 2D1.1(b)(2). The court applied the enhancement after finding by a preponderance of the evidence that Tony used or directed the use of violence by ordering various firebombing attacks.

Tony doesn't dispute that at the time of his sentencing, the law in our circuit was that a district court "may consider uncharged and acquitted conduct in determining a sentence, as long as that conduct is proven by a preponderance of the evidence." *United States v. Medley*, 34 F.4th 326, 335–36 (4th Cir. 2022) (citation modified). Nor does he

31

claim that the district court's findings weren't supported by a preponderance of the evidence.

Instead, Tony highlights that the guidelines have since been amended to specify that acquitted conduct shouldn't typically be considered in sentencing. *See* U.S.S.G. § 1B1.3(c). But he doesn't make any legal argument that we should apply the amendment retroactively on direct appeal.[5]

Instead, he urges us to act out of compassion and exercise our discretion to vacate his sentence given the change in law. This we cannot do. Because the district court could consider acquitted conduct at the time of Tony's sentencing, we discern no clear error, and we decline to remand on other grounds.

We note too that any error in calculating Tony's base offense level was harmless. U.S.S.G. § 2D1.1(c) sets a base offense level of 32 for any offense involving between 3,000 and 10,000 kilograms of marijuana. The presentence investigation report attributed 3,400 kilograms of marijuana to Tony, which aligns with the jury's finding that he conspired to distribute at least 1,000 kilograms of marijuana.

---

[5] Nor could he, since we've held that only clarifying amendments, not substantive ones, apply retroactively. *See United States v. Goines*, 357 F.3d 469, 474 (4th Cir. 2004). The acquitted conduct amendment was substantive because it changed the law in this circuit. *See id.*; *see also United States v. Shanks*, No. 24-12247, 2025 WL 1621179, at *4 (11th Cir. June 9, 2025) (per curiam) (holding that the acquitted conduct amendment was a substantive change and doesn't apply retroactively on direct appeal).

32

Tony doesn't contest the 3,400 figure referenced in the report. So even if the district court attributed 500 grams of cocaine to Tony instead of 15 kilograms, it still would have assigned Tony the same base offense level.

C.

Tony next argues that the district court erred by applying an enhancement for possession of a firearm because there wasn't a sufficient connection between the firearms and his drug activity.

U.S.S.G. § 2D1.1(b)(1) provides for a two-level enhancement if the defendant possessed "a dangerous weapon (including a firearm)." The enhancement "should be applied if the weapon was present, unless it is clearly improbable that the weapon was connected with the offense." U.S.S.G. § 2D1.1(b)(1) cmt. n.11(A). We also consider whether the firearm was "possessed in connection with drug activity that was part of the same course of conduct or common scheme as the offense of conviction." *United States v. McAllister*, 272 F.3d 228, 233 (4th Cir. 2001) (citation modified).

The government can prove this connection by establishing "a temporal and spatial relation linking the weapon, the drug trafficking activity, and the defendant." *United States v. Mondragon*, 860 F.3d 227, 231 (4th Cir. 2017) (citation modified). And "in circumstances where the underlying offense is conspiracy to distribute drugs," the discovery of a gun "in a place where the conspiracy was carried out or furthered is sufficient to link the weapon to the conspiracy." *United States v. Bolton*, 858 F.3d 905, 912 (4th Cir. 2017) (citation modified).

33

The district court relied on testimony from gang members who recalled that Tony possessed firearms. These witnesses testified that Tony kept a gun at his house, where he also received marijuana shipments. This evidence provides the "temporal and spatial relation" necessary to link the firearm to the drug trafficking offense. *See Mondragon*, 860 F.3d at 231 (citation modified).

Tony doesn't argue that it was "clearly improbable" that his possession of a firearm was connected to his drug trafficking activity. So the district court didn't clearly err by applying the firearm enhancement. *See id.* at 232.

### D.

The district court also applied a four-level enhancement because Tony was a leader of criminal activity. On this issue, courts consider "the exercise of decision-making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others." U.S.S.G. § 3B1.1(a) cmt. n.4.

Tony maintains that he wasn't a member of the Reccless Tigers and didn't have a leadership role. But the evidence contradicts these claims. The record shows that Tony (1) was an early member of the Reccless Tigers, (2) was heavily involved in the gang's drug production and distributions, (3) was active in recruitment, (4) founded the Tiger Side offshoot, and (5) was considered by other members to be a leader.

34

In particular, the district court credited testimony from witnesses who said that "they were all acting under the direction of Tony" and that "they took their orders from [Tony] in the distribution and the receipt of funds for the sale of drugs." J.A. 4821–22. Based on this evidence, the district court reasonably imposed the leadership enhancement.

E.

Tony's final argument for procedural unreasonableness is that the district court failed to abide by the guidance in 18 U.S.C. § 3553(a)(6) to "avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." Tony asserts that his sentence created an unwarranted disparity between himself and other codefendants who received lighter sentences for similar conduct.

Yet we recently clarified that "a sentence is not unreasonable under § 3553(a)(6) merely because it creates a disparity with a co-defendant's sentence." *United States v. Lawson*, 128 F.4th 243, 257 (4th Cir. 2025) (citation modified). Rather, "§ 3553(a)(6)'s primary purpose is to fulfill the guidelines' goal to eliminate unwarranted sentencing disparities *nationwide*." *Id.* (citation modified).

Tony offers no evidence that his sentence was out of line with nationwide sentences for similar conduct. The district court also addressed Tony's argument at sentencing, and it explained that his sentence was justified because he was "undeniably the leader" of the gang and was "at the epicenter if [the gang's] money-making enterprise." J.A. 4846–49. Therefore, the district court satisfied its obligation to consider Tony's objection and explain why it rejected the argument. *See United States v. Bollinger*, 798 F.3d 201, 220 (4th Cir. 2015).

35

VII.

Finally, we consider Lamborn, Yoo, and Peter's claim that the conditions of supervised release in their written judgments are inconsistent with the conditions the district court announced at sentencing.

A.

We review "the consistency of [an] oral sentence and the written judgment de novo, comparing the sentencing transcript with the written judgment to determine whether an error occurred as a matter of law." *United States v. Rogers*, 961 F.3d 291, 296 (4th Cir. 2020) (citation modified). A district court must announce any non-mandatory conditions of a defendant's supervised release at sentencing, because a defendant "has the right to be present when he is sentenced." *Id.*; *see also* Fed. R. Crim. P. 43(a)(3).

B.

When the district court announced the supervised release portions of Lamborn, Yoo, and Peter's respective sentences, it described only a few "special conditions" for each Defendant. Yet their written judgments all contain additional conditions of release not mentioned at their hearings.

The judgments include all the "standard" (but non-mandatory) conditions recommended under the federal sentencing guidelines. While the district court wasn't required to enumerate them at sentencing, it needed to expressly incorporate the conditions by reference. *See Rogers*, 961 F.3d at 299. The judgments also each include at least one "special" condition for each Defendant that wasn't announced at sentencing—for instance, prohibiting all Defendants from incurring new credit charges, or requiring Lamborn to

36

make a "good faith effort to obtain his GED." *Compare* J.A. 4757, *with* J.A. 4767–68; *compare* J.A. 4750, *with* J.A. 4783–84; *compare* J.A. 4753, *with* J.A. 4775–76.

Our precedent is clear. Since the written judgments contain non-mandatory conditions of release that weren't announced at sentencing, we must vacate Lamborn, Yoo, and Peter's judgments and remand for resentencing. *See Rogers*, 961 F.3d at 294; *United States v. Mathis*, 103 F.4th 193, 195 (4th Cir. 2024). The government concedes as much.

\*     \*     \*

For these reasons, we vacate Lamborn, Yoo, and Peter's sentences, and remand for resentencing. In all other respects, we affirm.

*AFFIRMED IN PART, VACATED IN PART, AND REMANDED*